# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued April 18, 2023        Decided August 8, 2023

No. 22-7010

ROSALIE SIMON, ET AL.,
APPELLEES

v.

REPUBLIC OF HUNGARY AND MAGYAR ALLAMVASUTAK ZRT.,
(MAV ZRT.),
APPELLANTS

———

Consolidated with 22-7013, 22-7112

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:10-cv-01770)
(No. 1:21-cv-01739)

———

*Gregory Silbert* argued the cause for defendants-appellants/cross-appellees Republic of Hungary, et al. With him on the briefs was *Konrad L. Cailteux.*

*L. Marc Zell* and *David H. Weinstein* argued the causes for plaintiffs-appellees/cross-appellants Rosalie Simon, et al. and

Steven Heller, et al. With them on the briefs were *Noam Schreiber*, *Charles S. Fax*, *Liesel J. Schopler*, and *Paul G. Gaston.*

*Andrew D. Freeman* and *Anthony J. May* were on the brief for *amicus curiae* Professor Vivian Grosswald Curran in support of plaintiffs-appellees/cross-appellants.

Before: PILLARD and CHILDS, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge.*

Opinion for the Court filed by *Circuit Judge* PILLARD and *Circuit Judge* CHILDS.

Opinion concurring in part and dissenting in part filed by *Senior Circuit Judge* RANDOLPH.

PILLARD and CHILDS, *Circuit Judges*: These two consolidated cases arise out of the Hungarian government's confiscation of property owned by Jews during the Holocaust. "Nowhere was the Holocaust executed with such speed and ferocity as it was in Hungary." *Simon v. Republic of Hungary*, 812 F.3d 127, 133 (D.C. Cir. 2016) (quoting *Simon*, First Am. Compl. ¶ 1 (J.A. 44)). In 1944, as World War II neared its end, the Hungarian government implemented an accelerated campaign to exterminate its remaining Jewish population. Within a matter of months, the government systematically executed over half a million Jews—roughly two-thirds of the Jewish population in Hungary at the war's outset. This state-perpetrated genocidal campaign ranks among the greatest crimes in human history.

The questions raised by these appeals bear on whether survivors of the Hungarian Holocaust may hale the Hungarian government and its instrumentalities into United States courts

to answer for a subset of the wrongs they committed—namely, their confiscation of property from victims of the Holocaust. The plaintiffs invoke the Foreign Sovereign Immunities Act's expropriation exception as a means to pierce the Hungarian state's sovereign immunity and assert jurisdiction in federal district court. Defendants object that the exception is inapplicable.

In the first of the two cases consolidated before us, *Simon v. Republic of Hungary*, fourteen survivors of the Hungarian Holocaust sue the Republic of Hungary and one of its agencies, Magyar Államvasutak Zrt., seeking compensation for the seizure of their property during the Holocaust. The litigation in *Simon* is long running, and we have reviewed appeals in the case twice before. In the second case, *Heller v. Republic of Hungary*, two Holocaust survivors more recently sued for compensation from Hungary for property confiscated from their late parents and grandparents during the war.

Cognizant of the Supreme Court's recent holding that "a country's alleged taking of property from its own nationals" generally falls outside the scope of the Foreign Sovereign Immunities Act's expropriation exception, *Fed. Republic of Germany v. Philipp*, 141 S. Ct. 703, 708 (2021); *see id.* at 715, the plaintiffs in these suits assert they were not Hungarian nationals at the time of the takings at issue. They instead claim that they were either stateless or Czechoslovakian nationals. The district court dismissed the claims of the plaintiffs asserting statelessness but concluded that most of the plaintiffs asserting Czechoslovakian nationality could proceed.

We largely affirm. Like the district court, we conclude that the plaintiffs claiming statelessness—Zehava Friedman, Vera Deutsch Danos, Steven Heller, and Charles Heller—have not made out a recognized claim within a Foreign Sovereign

Immunities Act exception. Assuming without deciding that those plaintiffs were *de facto* stateless at the time of the alleged takings, as they claim, the plaintiffs have nevertheless failed to identify adequate affirmative support in sources of international law for their contention that a state's taking of a stateless person's property amounts to a taking "in violation of international law" within the meaning of the Foreign Sovereign Immunities Act. 28 U.S.C. § 1605(a)(3). We do not foreclose the possibility that such a takings claim might prevail if grounded in sources of international law not before us or based on arguments not raised here. But on this record, we affirm the district court's dismissal of those four plaintiffs' claims.

We likewise affirm the district court's denial of the defendants' motions to dismiss the claims of some of the plaintiffs asserting Czechoslovakian nationality, with a few exceptions. The district court correctly determined that four of those plaintiffs—Magda Kopolovich Bar-Or, Yitzhak Pressburger, Alexander Speiser, and Moshe Perel—had plausibly alleged they were Czechoslovakian nationals at the time of the takings. As for the five Lebovics sisters, the district court should have dismissed their claims, along with those of Tzvi Zelikovitch and Ella Feuerstein Schlanger, for failure to plausibly allege Czechoslovakian nationality. We direct that those dismissals, however, be without prejudice to the opportunity of any of those plaintiffs to amend in the event they can cure the identified defects in their nationality allegations.

In reaching this conclusion, we reject the Hungarian defendants' arguments that the plaintiffs are judicially estopped from asserting Czechoslovakian nationality and that, even assuming they were Czechoslovakian at the time of the takings, the Foreign Sovereign Immunities Act's treaty exception bars their claims. We also reject the plaintiffs'

theory that Hungary's alleged treaty violations enable the plaintiffs to bypass the domestic takings rule.

Hungary and its instrumentality also assert that the plaintiffs' claims of expropriation in violation of international law lack the nexus to commercial activity in the United States that the Foreign Sovereign Immunities Act requires. We remand for the district court to make certain factual determinations regarding that nexus element of the remaining plaintiffs' claims.

All told, the claims of four *Simon* plaintiffs may proceed, and an additional eight *Simon* plaintiffs will have the opportunity to amend their pleadings. The district court, however, appropriately dismissed the *Heller* plaintiffs' claims.

I.

A.

The historical events giving rise to these suits are recounted at length in our first two opinions in the *Simon* litigation, *see Simon v. Republic of Hungary* (*Simon I*), 812 F.3d 127, 132-34 (D.C. Cir. 2016), *abrogated in part by Fed. Republic of Germany v. Philipp*, 141 S. Ct. 703 (2021); *Simon v. Republic of Hungary* (*Simon II*), 911 F.3d 1172, 1176-78 (D.C. Cir. 2018), *vacated*, 141 S. Ct. 691 (2021) (per curiam), as well as the district court's *Simon* and *Heller* opinions, *see Simon v. Republic of Hungary* (*Simon-2021*), 579 F. Supp. 3d 91, 97-99 (D.D.C. 2021); *Heller v. Republic of Hungary*, No. 21-cv-1739-BAH, 2022 WL 2802351, at *1-2 (D.D.C. July 18, 2022). Further background is provided here as relevant to the disputes at issue.

We begin with a brief account of Hungary's evolving borders during the early twentieth century and their

implications for the nationalities of persons living in affected territory. Prior to World War I, the Austro-Hungarian Empire controlled a significant share of European territory, including parts of modern-day Hungary, Slovakia, and the Czech Republic. At the war's end, however, the Austro-Hungarian Empire was dismembered into several smaller states organized primarily along ethno-linguistic lines. The Kingdom of Hungary, which had been part of the Austro-Hungarian Empire, ceded approximately two-thirds of its territory to newly created states. The territory Hungary retained is often referred to as "Trianon Hungary," in recognition of the treaty that largely defined its borders: the 1920 Treaty of Trianon. Treaty of Peace Between the Allied and Associated Powers and Hungary arts. 27-35, June 4, 1920, S. Treaty Doc. No. 67-348 (1923) (Treaty of Trianon). In that treaty, Hungary also agreed to recognize the independence of a new nation state, Czechoslovakia, in an area that had comprised the northern region of the Austro-Hungarian Empire. *See id.* art. 48.

As relevant here, two post-war treaties governed the assignment of nationalities to persons in the territories ceded by Hungary to Czechoslovakia. First, the 1919 Treaty of St. Germain required the newly created state of Czechoslovakia to extend its citizenship to most Hungarian nationals who were habitually residing in the territory that became part of Czechoslovakia. Treaty Between the Principal Allied and Associated Powers and Czechoslovakia art. 3, Sept. 10, 1919, S. Treaty Doc. No. 67-348 (1923) (St. Germain Treaty). The St. Germain Treaty also established that "[a]ll persons born in Czecho-Slovak territory who are not born nationals of another State shall" acquire Czechoslovakian nationality. *Id.* art. 6. Second, the 1920 Treaty of Trianon included parallel provisions granting Czechoslovakian nationality to, and stripping Hungarian nationality from, those who had "rights of citizenship" in the territory that became part of

Czechoslovakia, Treaty of Trianon art. 61, subject to certain conditions and exceptions, *id.* arts. 62-66.

The borders of this newly conceived Czechoslovakian state, however, did not last. In 1938 and 1939, on the eve of World War II in Europe, Nazi Germany and Hungary illegally annexed parts of Czechoslovakia. Hungary thereafter sought to re-nationalize persons living in annexed regions who had lived there continuously from 1929 to 1939, and who had been Hungarian citizens as of 1921. In practice, however, "Hungarian officials imposed excessively stringent demands for proof of Hungarian citizenship upon Jews, making it virtually impossible for most Jewish residents of [annexed territory] to comply, with the result that they did not acquire Hungarian citizenship." Bar-Shaked Decl. ¶ 62 (J.A. 1868); *see id.* ¶ 61 & n.31 (J.A. 1867). Hungarian laws also prohibited Jews from obtaining Hungarian citizenship by naturalization. *Id.* ¶ 31 (J.A. 1853).

After it became clear that they would lose the war, Nazi Germany and Hungary "raced to complete their eradication of the Jews before the Axis surrendered." *Simon* Second Am. Compl. (*Simon* SAC) ¶ 3 (J.A. 238). Winston Churchill described Hungary's genocidal campaign as "probably the greatest and most horrible crime ever committed in the history of the world." *Simon I*, 812 F.3d at 132. The Axis powers wiped out more than two-thirds of Hungary's pre-war Jewish population during the course of the war. *Id.* at 134. "The overwhelming majority of those deaths came from the roughly 430,000 Hungarian Jews deported to Auschwitz" or other concentration camps. *Id.* On November 3, 1944, the Hungarian government declared all valuable objects owned by Jews—except for their most personal items—part of the national wealth of Hungary. Hungary confiscated and liquidated much of that property.

At the close of World War II, the Allied and Associated Powers entered into a peace treaty with Hungary. Treaty of Peace with Hungary, Feb. 10, 1947, 61 Stat. 2065, 41 U.N.T.S. 135 (1947 Treaty). The 1947 Treaty declared Hungary's annexation of Czechoslovakian territory null and void and returned to Czechoslovakia certain regions Hungary had illegally annexed. *Id.* art 1.

## B.

The Foreign Sovereign Immunities Act (FSIA) provides "the sole basis for obtaining jurisdiction over a foreign state in our courts." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989); *see* 28 U.S.C. § 1602 *et seq*. Absent a pre-existing agreement with the United States affecting the scope of sovereign immunity, a foreign sovereign is generally immune, unless one of the FSIA's enumerated exceptions applies. *See* 28 U.S.C. §§ 1604, 1605-1605B, 1607; *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 31 (2015).

This case concerns the FSIA's expropriation exception, codified at Title 28, Section 1605(a)(3). That exception waives foreign sovereign immunity in any case in which:

> [1] rights in property taken in violation of international law are in issue and [2.A.] that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or [2.B.] that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state

>   and that agency or instrumentality is engaged in
>   a commercial activity in the United States.

28 U.S.C. § 1605(a)(3). Generally speaking, the exception has two requirements: (1) the claim must put in issue "rights in property taken in violation of international law," and (2) there must be an adequate connection between the defendant and both the expropriated property and some form of commercial activity in the United States. *Id.* We refer to the latter as the commercial-activity nexus requirement.

With respect to the first requirement, the Supreme Court in *Philipp* held that "the phrase 'rights in property taken in violation of international law,' as used in the FSIA's expropriation exception, refers to violations of the international law of expropriation, and thereby incorporates the domestic takings rule." 141 S. Ct. at 715. Under the domestic takings rule, a foreign sovereign's taking of its own nationals' property is not a violation of the international law of expropriation. *Id.* at 709. *Philipp* thus generally bars plaintiffs who were nationals of the expropriating state at the time of the alleged taking from invoking the expropriation exception. *See id.* at 715.

The FSIA also contains a provision known as the "treaty exception." *Simon I*, 812 F.3d at 135-36; *see* 28 U.S.C. § 1604. Per that provision, the FSIA's baseline grant of immunity to foreign sovereigns is "[s]ubject to existing international agreements to which the United States [was] a party at the time of enactment" of the FSIA. 28 U.S.C. § 1604. "[I]f there is a conflict between the FSIA and such an agreement regarding the availability of a judicial remedy against a contracting state, the agreement prevails." *de Csepel v. Republic of Hungary* (*de Csepel II*), 859 F.3d 1094, 1100 (D.C. Cir. 2017) (quoting *de*

*Csepel v. Republic of Hungary* (*de Csepel I*), 714 F.3d 591, 601 (D.C. Cir. 2013)).

C.

Two cases are consolidated before us on appeal: *Simon v. Republic of Hungary* and *Heller v. Republic of Hungary.* The plaintiffs in these cases—Rosalie Simon, Helen Herman, Charlotte Weiss, Helena Weksberg, Rose Miller, Tzvi Zelikovitch, Magda Kopolovich Bar-Or, Zehava (Olga) Friedman, Yitzhak Pressburger, Alexander Speiser, Tibi Ram, Moshe Perel, Vera Deutsch Danos, Ella Feuerstein Schlanger, Steven Heller, and Charles Heller—are survivors of the Hungarian Holocaust (collectively, Survivors).

Many were teenagers when Magyar Államvasutak Zrt (MÁV), the Hungarian national railway, delivered them to concentration camps in cattle cars. Two fled abroad and one remained in hiding and avoided deportation. The Survivors claim to have never received compensation for the personal property the Hungarian defendants allegedly stole from them, often while they were being transported to concentration camps or killing fields.

1.

The *Simon* litigation has been ongoing for more than a decade. The case was filed on October 20, 2010, as a putative class action by plaintiffs Simon, Herman, Weiss, Weksberg, Miller, Zelikovitch, Bar-Or, Friedman, Pressburger, Speiser, Danos, Schlanger, Tibi Ram, and soon thereafter was amended to add plaintiff Perel (collectively, the *Simon* Survivors or *Simon* plaintiffs). Simon, Herman, Weiss, Weksberg, and Miller are sisters, whose maiden name was Lebovics (collectively, Lebovics sisters). The *Simon* Survivors filed their complaint against the Republic of Hungary (Hungary) and

MÁV (together, the Hungarian defendants). (One other defendant was dismissed on grounds not challenged here).

The Hungarian defendants moved to dismiss for lack of subject matter jurisdiction based on, *inter alia*, the FSIA's treaty exception, the *Simon* Survivors' failure to allege the elements necessary to invoke the expropriation exception, and the political question doctrine. The district court granted the Hungarian defendants' motion, holding that the FSIA's treaty exception immunized them from suit. *See Simon v. Republic of Hungary* (*Simon-2014*), 37 F. Supp. 3d 381, 424 (D.D.C. 2014). Because the district court deemed the treaty exception dispositive, it declined to resolve the defendants' alternative grounds for dismissal. *See id.* at 407 n.21.

The *Simon* Survivors appealed, and we reversed. In *Simon I*, we held that the treaty exception did not divest the court of jurisdiction over the case because the *Simon* Survivors' action based on common-law claims did not create an express conflict between the treaty provision on which the Hungarian defendants relied, Article 27 of the 1947 Treaty, and the FSIA immunity provisions. *Simon I*, 812 F.3d at 140. We further held that the expropriation exception applied to the *Simon* plaintiffs' claims that they had been deprived of property without compensation. *Id.* at 132, 140-49. We concluded that those claims put in issue property "taken in violation of international law" for purposes of the FSIA's expropriation exception, because the alleged takings of property amounted to the commission of genocide. *Id.* at 142 (quoting 28 U.S.C. § 1605(a)(3); *see id.* at 141-46. Additionally, we concluded that the *Simon* plaintiffs' allegations satisfied the commercial-activity nexus of the expropriation exception. *Id.* at 146-49. We remanded the matter for the district court to consider "whether, as a matter of international comity, it should refrain from exercising jurisdiction over th[e] [*Simon* plaintiffs']

claims until the plaintiffs exhaust domestic remedies in Hungary." *Id.* at 151.

On remand from *Simon I*, the *Simon* Survivors filed an amended complaint, and the Hungarian defendants moved to dismiss a second time. The defendants sought dismissal based on, *inter alia*, *forum non conveniens* and international comity grounds. The district court granted the Hungarian defendants' motion to dismiss on both grounds. *Simon v. Republic of Hungary* (*Simon-2017*), 277 F. Supp. 3d 42, 47, 62, 67 (D.D.C. 2017).

The *Simon* Survivors appealed a second time. We again reversed, holding that the district court erred in concluding that the doctrine of *forum non conveniens* barred the *Simon* plaintiffs' suit and in declining statutorily secured jurisdiction on international comity grounds. *Simon II*, 911 F.3d at 1176 (citing *Philipp v. Fed. Republic of Germany*, 894 F.3d 406 (D.C. Cir. 2018)).

The parties then litigated a third motion to dismiss that focused on whether the *Simon* plaintiffs' claims satisfied the expropriation exception's commercial-activity nexus requirement. *Simon v. Republic of Hungary* (*Simon-2020*), 443 F. Supp. 3d 88, 116 (D.D.C. 2020). The district court denied the motion and another appeal was taken in this case—this time with the Hungarian defendants as the appellants. *Id.*

In the meantime, the Supreme Court granted the Hungarian defendants' petition for certiorari in *Simon II* on the international comity question. The Supreme Court decided this case simultaneously with *Philipp*, a related FSIA case. The *Philipp* Court held that "the expropriation exception is best read as referencing the international law of expropriation rather than of human rights." 141 S. Ct. at 712. *Philipp* thus clarified that genocidal takings do not necessarily constitute takings "in

violation of international law" for purposes of the FSIA's expropriation exception, *id.* at 715 (quoting 28 U.S.C. § 1605(a)(3)), thereby partially abrogating our opinion in *Simon I.* Without resolving the question of international comity on which the Court had granted certiorari in this case, the Supreme Court issued a judgment vacating our *Simon II* decision and remanded the matter for further proceedings consistent with *Philipp.* *Republic of Hungary v. Simon*, 141 S. Ct. 691 (2021) (per curiam). In light of the Supreme Court's ruling, we remanded the case to the district court for further proceedings consistent with *Philipp.*

With *Simon* back before the district court, the Hungarian defendants moved, for a fourth time, to dismiss the *Simon* Survivors' claims for lack of subject matter jurisdiction under the FSIA. The Hungarian defendants argued, *inter alia*, that the domestic takings rule barred the *Simon* plaintiffs from invoking the expropriation exception. They also argued that, even if any *Simon* plaintiffs had been foreign nationals, the treaty exception would divest the court of jurisdiction. In response to the defendants' domestic takings rule argument, the *Simon* Survivors asserted that they were not Hungarian nationals at the time of the alleged takings. They argued that, during the relevant time period, two of the *Simon* Survivors were *de facto* stateless and twelve were Czechoslovakian nationals. The district court partially granted the motion, with the outcome varying by Survivor. *Simon-2021*, 579 F. Supp. 3d at 140-41. The Hungarian defendants appeal and the *Simon* Survivors cross-appeal.

2.

That brings us to the second action in this consolidated appeal. More than a decade after the *Simon* litigation began, a separate group of survivors brought a similar lawsuit against

Hungary. The named plaintiffs, Charles Heller and Steven Heller (together, *Heller* Survivors or *Heller* plaintiffs), are brothers. They were toddlers in 1939, when their parents and grandparents abandoned their businesses, personal possessions, and homes in Hungary and fled with the brothers to the United States. After the war, the Heller family returned to Hungary to find other people living in their homes, operating their businesses, and using their possessions. The *Heller* Survivors do not claim to have been Czechoslovakian citizens, nor do they claim to have acquired any non-Hungarian nationality before the takings. Rather, they assert that they were *de facto* stateless at the time of the alleged takings. Just as it had in *Simon*, Hungary moved to dismiss the Hellers' claims for lack of jurisdiction under the FSIA. Hungary argued that the domestic takings rule barred application of the FSIA's expropriation exception because, according to Hungary, both *Heller* plaintiffs were Hungarian nationals at the time of the alleged takings. The district court granted Hungary's motion and dismissed the *Heller* Survivors' claims. The brothers appeal.

## II.

We begin with the Survivors' cross-appeal in *Simon* and direct appeal in *Heller* challenging the district court's dismissals of the claims of the Survivors asserting *de facto* statelessness. We refer to those plaintiffs as the Trianon Survivors. They argue that, because Hungary rendered them *de facto* stateless by the time of the alleged takings, the domestic takings rule poses no bar to their claims against Hungary. The district court rejected that argument. It granted the Hungarian defendants' motions to dismiss the Trianon Survivors' claims as incompatible with the Supreme Court's ruling in *Philipp*. *See Simon-2021*, 579 F. Supp. 3d at 115-19, 140; *Heller*, 2022 WL 2802351, at *7-9.

The district court reasoned that, if the conduct alleged to have rendered the Trianon Survivors stateless also amounted to genocide, *Philipp* forecloses that statelessness from triggering the expropriation exception. *Simon-2021*, 579 F. Supp. 3d at 119; *Heller*, 2022 WL 2802351, at *8. Thus, stopping short of deciding whether the domestic takings rule is generally inapplicable to stateless aliens, the district court read *Philipp* to bar FSIA expropriation claims by plaintiffs claiming *de facto* statelessness by virtue of experiencing genocide. *Simon-2021*, 579 F. Supp. 3d at 119; *Heller*, 2022 WL 2802351, at *7 ("Whatever the merits of plaintiffs' argument that the domestic takings rule does not, as a general matter, reach claims by stateless persons, . . . *Philipp* 'precludes reliance on the egregiousness or genocidal nature of expropriative conduct as a means to escape the limitation of the domestic takings rule.'" (quoting *Simon-2021*, 579 F. Supp. 3d at 115)). We review the district court's jurisdictional rulings on questions of law *de novo*, *Ivanenko v. Yanukovich*, 995 F.3d 232, 236 (D.C. Cir. 2021), and factual determinations for clear error, *Price v. Socialist People's Libyan Arab Jamahiriya*, 389 F.3d 192, 197 (D.C. Cir. 2004).

We affirm the dismissal of the Trianon Survivors' claims, albeit for reasons different from those of the district court. The Supreme Court's ruling in *Philipp* does not foreclose the Trianon Survivors' theory. That said, the Survivors have failed to identify affirmative support in sources of international law for their legal premise that a state's taking of property from stateless persons amounts to a taking "in violation of international law" within the meaning of the FSIA, 28 U.S.C. § 1605(a)(3)—that is, in violation of "the international law of expropriation," *Philipp*, 141 S. Ct. at 712, 715. The Trianon Survivors have thus failed to persuade us that their claims are cognizable under the expropriation exception.

16

A.

We first address the parties' dispute over the implications of *Philipp*, 141 S. Ct. 703.  The Hungarian defendants argue that the Survivors' takings theory is "the same one that the Supreme Court already rejected" in *Philipp*: "[t]hat expropriations violate international law when they are accompanied by egregious human-rights violations."  Hungary Resp. & Reply Br. 27.  In defendants' view, *Philipp* precludes the Survivors from relying on "the egregiousness of the human rights abuses" inflicted by a foreign sovereign to claim statelessness and thereby escape the limitation of the domestic takings rule.  *Id.* at 28; *see also Simon-2021*, 579 F. Supp. 3d at 115-19; *Heller*, 2022 WL 2802351, at \*7-9.  Defendants miss the key distinction between the *Simon I* theory the Supreme Court rejected in *Philipp* and the Trianon Survivors' position on remand that is now before us.

The Trianon Survivors' theory does not conflict with *Philipp*, but heeds its guidance.  *Philipp* holds that "the phrase 'rights in property taken in violation of international law,' as used in the FSIA's expropriation exception, refers to violations of the international law of expropriation."  141 S. Ct. at 715 (quoting 28 U.S.C. § 1605(a)(3)).  Here is the relevant framework as we understand it post-*Philipp*:  The international law of expropriation incorporates the domestic takings rule, which treats a state's taking of its own national's property as a domestic legal matter not governed by international law.  *See id.* at 709, 715.  That rule is grounded in the traditional view that "international law customarily concerns relations among sovereign states, not relations between states and individuals."  *Id.* at 709-10.  Because "[a] domestic taking . . . d[oes] not interfere with relations among states," it does not "implicate[] the international legal system" under that traditional view.  *Id.* at 710; *see also Mezerhane v. República Bolivariana de*

*Venezuela*, 785 F.3d 545, 551 (11th Cir. 2015). In the wake of World War II, even as "international law increasingly came to be seen as constraining how states interacted not just with other states but also with individuals, including their own citizens," the "domestic takings rule endured" within the sphere of the international law of expropriation. *Philipp*, 141 S. Ct. at 710. Accordingly, in determining whether the expropriation exception applies post-*Philipp*, courts generally must identify a plaintiff's nationality for purposes of the domestic takings rule. Absent any superseding principle or rule encompassed in the international law of expropriation, the threshold question is: Was the victim of the alleged taking a national of the foreign-state defendant at the time of the taking? If yes, the domestic takings rule bars application of the FSIA's expropriation exception; if no, that bar is inapplicable. *See id.* at 715.

The Trianon Survivors have attempted to advance a viable theory within the framework established by *Philipp*—that is, based on an argument about their nationality at the time of the alleged takings. They acknowledge that they were Hungarian nationals before the war and do not claim that Hungary had formally denationalized its Jewish population *de jure* by the time of the alleged takings. They nonetheless contend the domestic takings rule is inapplicable because Hungary had rendered them *de facto* stateless for purposes of international law before it took their property.

To that end, the Survivors draw on a 1955 decision of the Permanent International Court of Justice that a nation may not, consistent with international law, *confer* nationality upon an individual (at least for purposes of exercising diplomatic protection in an international tribunal) where there is no "genuine connection" between that individual and the state. *Nottebohm Case* (*Liech. v. Guat.*), Judgment, 1955 I.C.J. Rep.

4, 23, 26 (Apr. 6). The Survivors claim that the inverse principle must also be true: A state *deprives* an individual of their nationality when it severs the "genuine connection" between itself and the individual. And, according to the Survivors, Hungary severed that requisite connection by subjecting Hungarian Jews to systematic persecution during the Holocaust, thus rendering the Trianon Survivors *de facto* stateless for purposes of international law. *See* Survivors' Reply Br. 8-12; Survivors' Br. 18-25. Such *de facto* stateless persons, they claim, are properly treated as "aliens" for purposes of the domestic takings rule. Survivors' Br. 18. That theory conforms to the analytic framework established by *Philipp*: It draws on international law governing nationality to argue that the Trianon Survivors were not Hungarian nationals at the time of the alleged takings. The Trianon Survivors' argument faces other obstacles, as discussed below, but it does not conflict with *Philipp* itself.

The Hungarian defendants' contrary reading of *Philipp*, while not without some logical appeal, breaks down on closer scrutiny. It is true, as the Hungarian defendants note, that the *Philipp* Court rejected the plaintiffs' attempt to rely on international human rights law to satisfy the expropriation exception's "violation of international law" requirement. 141 S. Ct. at 712, 715. It follows, they reason, that expropriations that violate international law "because of the 'egregiousness of the human rights abuses'" involved cannot give rise to a viable takings claim for purposes of the FSIA's expropriation exception. Hungary Resp. & Reply Br. 28 (quoting Survivors' Br. 23). Because the Trianon Survivors rely on Hungary's genocidal acts during the Holocaust (*i.e.*, violations of international human rights law) as the basis for their loss of nationality, the Hungarian defendants contend that *Philipp* forecloses their theory. *See id.* at 27-28; *see also Simon-2021*, 579 F. Supp. 3d at 118.

That reading of *Philipp* suffers from two principal flaws. First, it is irreconcilable with the remand in *Philipp*. The Supreme Court expressly reserved judgment on the plaintiffs' alternative theory that Germany's alleged taking was "not subject to the domestic takings rule because the [plaintiffs] were not German nationals at the time of the transaction," and remanded for the district court to consider that argument in the first instance. *Philipp*, 141 S. Ct. at 715-16. Critically, the *Philipp* plaintiffs' only theory as to why they were not German nationals at the time of the alleged takings was materially identical to the Trianon Survivors' nationality argument here: They argued that "Jews may be deemed aliens of their respective countries during the Holocaust because they were not treated as citizens." Resp. Br. 15 n.5, *Philipp*, 141 S. Ct. 703 (No. 19-351); *see also id.* at 27-28. As counsel for the *Philipp* plaintiffs stated during oral argument, their theory was that "German governmental treatment of German Jews in the 1930s," *i.e.*, the same treatment that they argued amounted to genocide, "transgress[ed] th[e] nationality line." Oral Arg. Tr. 68:1-4, *Philipp*, 141 S. Ct. 703 (2021) (No. 19-351). When the Supreme Court chose to remand the *Philipp* plaintiffs' claims, it knew that the relevant conduct that could divest the plaintiffs of their nationality was part and parcel of the genocidal acts that they had claimed violated international human rights law. If the Court's reasoning in *Philipp* foreclosed that argument, there would have been no reason to remand.

Second, the Hungarian defendants' reasoning errs in treating the limits *Philipp* imposed on the legal basis of an expropriation actionable under the FSIA as also circumscribing the historical facts germane to a claim under the expropriation exception. *Philipp* clarified that "the expropriation exception is best read as referencing the international law of expropriation rather than of human rights." 141 S. Ct. at 712. Accordingly, "[w]e do not look to the law of genocide to

determine if we have jurisdiction over [a plaintiff's] property claims. We look to the law of property." *Id.* That ruling barred the plaintiffs from relying on the law of genocide to avoid the domestic takings rule, which the Court viewed as an integral principle of the international law of expropriation. *See id.* at 709-13, 715. What *Philipp* did not do, however, is limit the underlying facts a court may consider in identifying whether the expropriation exception applies or the domestic takings rule is a bar. *Philipp* did not opine on, let alone foreclose, the possibility that conduct that could give rise to a claim of genocide might also bear on the nationality inquiry for purposes of the expropriation exception or the domestic takings rule. Rather, *Philipp* left open for lower courts to resolve what conduct is relevant to the nationality inquiry. *See id.* at 716. We thus reject the view that *Philipp* preempts the Trianon Survivors' takings theory.

B.

The Trianon Survivors' invocation of the expropriation exception nevertheless fails for an independent reason: Even assuming the Trianon Survivors were *de facto* stateless at the time of the alleged takings, the Survivors have not mustered adequate support for their contention that a state's taking of a *de facto* stateless person's property violates the international law of expropriation.

Our inquiry regarding the rights of *de facto* stateless persons is governed by the customary international law of expropriation. That body of law determines whether an alleged taking violates "international law" within the meaning of the FSIA's expropriation exception where, as here, the plaintiffs do not rely on an express international agreement. *See, e.g., Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela* (*Helmerich II*), 743 F. App'x 442, 449 (2018)

(citing Restatement (Third) of Foreign Relations Law § 102(1) (Am. L. Inst. 1987) (Third Restatement)); *Beierwaltes v. L'Office Federale de la Culture de la Confederation Suisse*, 999 F.3d 808, 821 (2d Cir. 2021). Customary international law is the "general and consistent practice of states followed by them from a sense of legal obligation." Third Restatement § 102(2). To demonstrate a taking in violation of international law for purposes of the FSIA's expropriation exception, the Survivors must show that their legal theory "has in fact crystallized into an international norm that bears the heft of customary law." *Helmerich II*, 743 F. App'x at 449.

To support their theory that a state's taking of a *de facto* stateless person's property violates the international law of expropriation, the Survivors principally rely on the Second Restatement of Foreign Relations Law. As the Restatement in effect when Congress enacted the FSIA, that source bears authoritative weight in interpreting the Act. *See Philipp*, 141 S. Ct. at 712 (recognizing "the [Court's] consistent practice of interpreting the FSIA in keeping with 'international law at the time of the FSIA's enactment' and looking to the contemporary Restatement for guidance" (quoting *Permanent Mission of India to United Nations v. City of New York*, 551 U.S. 193, 199-200 (2007))). The Survivors point to Section 185 of the Second Restatement, which identifies a "taking by a state of property of an alien" as "wrongful under international law" when certain conditions are met. Restatement (Second) of Foreign Relations Law § 185 (Am. L. Inst. 1965) (Second Restatement). And they emphasize that Section 171 establishes that the term "alien" encompasses both foreign nationals and stateless persons "for purposes of the responsibility of a state for injury" to an individual. *Id.* § 171.

Notably, however, Section 175 of the Second Restatement makes clear that stateless persons are "without remedy" under

international law for takings claims against an expropriating state, with certain exceptions. *See id.* § 175 & cmt. d. Section 175 provides:

> The responsibility of [a] state under international law for an injury to an alien cannot be invoked directly by the alien against the state except as provided by
>    (a) the law of the state,
>    (b) international agreement, or
>    (c) agreement between the state and the alien.

*Id.* § 175. And the lack of any remedy under customary international law for a stateless alien is spelled out in Comment (d) to that section:

> *d. Stateless aliens.* Under traditional principles of international law, a state, being responsible only to other states, could not be responsible to anyone for an injury to a stateless alien. Under the rule stated in this Section, a stateless alien may himself assert the responsibility of a state in those situations where an alien who is a national of another state may do so. However, in those situations not covered by the rule stated in this Section or by an international agreement providing some other remedy, a stateless alien is without remedy, since there is no state with standing to espouse his claim.

*Id.* § 175 cmt. d; *see also id.* § 174 cmt. b ("[P]rocedures allowing persons to proceed against states . . . are unavailable except under the limited conditions specified in § 175, and, espousal by the state of nationality continues to be generally necessary for the effective assertion of an international

claim."). In their briefing, the Survivors identify no Hungarian law, international agreement, or agreement between Hungary and the Trianon Survivors relevant to section 175 of the Second Restatement. Tellingly, after the Hungarian defendants pointed out the limits set forth in section 175 on when a stateless person has a remedy, *see* Hungary Resp. & Reply Br. 26-27, the Survivors abandoned reliance on that section in their reply and failed to explain why the defendants' point was not fatal to their theory, *see* Survivors' Reply Br. 2-12.

The secondary sources that the Survivors cite likewise fail to address that issue. To the extent those sources are helpful, they merely accord with the view that stateless persons are generally treated as aliens or non-nationals under state domestic laws. *See* Marc Vishniak, *The Legal Status of Stateless Persons*, *in* 6 Jews and the Post-War World 37 (Abraham G. Duker ed., 1945); Eric Fripp, Nationality and Statelessness in the International Law of Refugee Status § 5.105 (2016).

The Survivors have thus failed to persuade us that a state's taking of a *de facto* stateless person's property violates the customary international law of expropriation. To be clear, we do not foreclose the possibility that such support exists in sources of international law not before us in this case or based on arguments not advanced here. We note that the Survivors nowhere argue in their briefing that a state's taking of a stateless person's property may *violate* the international law of expropriation even if stateless persons are "without remedy" under international law for such violation, Second Restatement § 175 cmt. d. At oral argument, the Survivors for the first time implied as much when, in response to probing from the bench on the point, they contended that the FSIA's expropriation exception itself provides the necessary remedy for expropriations from stateless persons in violation of

international law.  *See* Oral Arg. 37:30-38:50, 41:58-42:25, 42:40-43:40.  Generally, however, "arguments raised for the first time at oral argument are forfeited." *Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 647 (D.C. Cir. 2020) (quoting *United States ex rel. Davis v. District of Columbia*, 793 F.3d 120, 127 (D.C. Cir. 2015)).  We accordingly decline to reach that late-raised argument and take no position here on its potential merit.

Our holding is more limited:  On this record, the Survivors have not demonstrated that their legal theory—that a state's taking of a *de facto* stateless person's property violates the international law of expropriation—has jelled into a binding rule of customary international law.  Because the Survivors have therefore failed to show that the alleged seizure of the Trianon Survivors' property amounts to a "violation of international law" for purposes of the FSIA's expropriation exception, 28 U.S.C. § 1605(a)(3), we affirm the district court's dismissal of their claims.

III.

Next, we address the parties' challenges to the district court's partial denial of the defendants' motion to dismiss the claims of the Survivors who assert that they were Czechoslovakian nationals at the time of the alleged takings. We refer to those plaintiffs as the Czechoslovakian Territory Survivors, as they each allege that they were either born or raised in Czechoslovakian territory.  The district court denied the defendants' motion to dismiss the claims of nine of the Czechoslovakian Territory Survivors—namely, Magda Kopolovich Bar-Or, Yitzhak Pressburger, Alexander Speiser, Moshe Perel, and the five Lebovics sisters. *See Simon-2021*, 579 F. Supp. 3d at 131-35, 140-41.  The court concluded that they had plausibly alleged Czechoslovakian nationality,

thereby bringing their claims outside the scope of the domestic takings rule. *See id.* at 131-35. However, the court dismissed the claims of one of the Czechoslovakian Territory Survivors (Ze'ev Tibi Ram) without prejudice, and the claims of two (Tzvi Zelikovitch and Ella Feuerstein Schlanger) with prejudice. *See id.* at 140. Because those plaintiffs had failed to adequately allege non-Hungarian nationality at the time of the alleged takings, the court reasoned, the domestic takings rule barred application of the FSIA's expropriation exception to their claims. *See id.* at 120-21, 135-36, 140.

The Hungarian defendants appeal the district court's denial of their motion as to the nine non-dismissed plaintiffs' claims. They argue that judicial estoppel precludes the Survivors from denying their Hungarian nationality at this stage in the litigation. The defendants further claim that the district court applied the wrong pleading standard in adjudicating their motion to dismiss the Czechoslovakian Territory Survivors' claims. And, in the alternative, they claim the Survivors' pleadings fall short even under the standard the district court applied.

The Survivors cross-appeal the district court's dismissal with prejudice of Zelikovitch and Schlanger's claims. They assert that the district court erroneously concluded that Zelikovitch and Schlanger had not plausibly alleged Czechoslovakian nationality at the time of the alleged takings. Neither party appeals the dismissal without prejudice of Ze'ev Tibi Ram's claim.

We largely affirm. We reject the Hungarian defendants' threshold arguments regarding judicial estoppel and the pleading standard for FSIA claims. Applying the same plausible-pleading standard that the district court applied, we affirm the court's disposition of the Czechoslovakian Territory

Survivors' claims, except that we direct the district court to convert its allowance of the claims of the Lebovics sisters to proceed and its dismissal of the claims of Zelikovitch and Schlanger to dismissals without prejudice so those plaintiffs may seek to cure the defects in their nationality allegations.

## A.

We first address the Hungarian defendants' argument that judicial estoppel bars the Czechoslovakian Territory Survivors from claiming Czechoslovakian nationality. The Hungarian defendants contend that in *Simon I* the Survivors asserted they were Hungarian nationals to avoid application of the FSIA's treaty exception, and thus cannot now deny Hungarian nationality in relation to the expropriation exception. The district court determined that the "defendants' judicial estoppel argument fails because defendants [did] not clearly show that the *Simon I* court relied on plaintiffs' representations of nationality in an outcome-determinative fashion." *Simon-2021*, 579 F. Supp. 3d at 127. We review the district court's decision to not invoke judicial estoppel for abuse of discretion. *See Montgomery v. IRS*, 40 F.4th 702, 709 (D.C. Cir. 2022); *Temple Univ. Hosp., Inc. v. NLRB*, 929 F.3d 729, 734 (D.C. Cir. 2019).

Judicial estoppel prevents a party from obtaining an unfair advantage by "prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (quoting *Pegram v. Herdrich*, 530 U.S. 211, 227 n.8 (2000)). Courts invoke judicial estoppel at their discretion to protect the integrity of the judicial process. *Id.* at 749-50. In evaluating whether to apply the doctrine of judicial estoppel, courts consider: "(1) whether the party's later position is 'clearly inconsistent' with its earlier position; (2)

'whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled'; and (3) 'whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.'" *Temple Univ. Hosp.*, 929 F.3d at 733 (quoting *New Hampshire*, 532 U.S. at 750-51). The three factors are not a formulaic test. *See New Hampshire*, 532 U.S. at 751. Rather, they serve as guideposts to determining whether the "balance of equities" weighs in favor of invoking the doctrine in a given case. *Id.*

Applying those principles, we conclude the district court exercised its sound discretion in holding that the balance of equities tilts against applying judicial estoppel here. To start, the first factor—whether a party's later position is "clearly inconsistent" with the earlier position on which it prevailed, *id.*—does not favor the Hungarian defendants. In *Simon I*, the parties did not litigate the question of those plaintiffs' nationality in relation to the treaty exception—the relevant legal issue on which the plaintiffs prevailed. *See* 812 F.3d at 135-40. And, while one sentence of the plaintiffs' reply brief in *Simon I* implied that they were Hungarian nationals, other portions of the plaintiffs' *Simon I* briefing ran expressly counter to that view. For instance, in arguing that the domestic takings rule did not bar their suit, the plaintiffs emphasized that they were "Hungarian nationals or citizens *in name only, not substance*, as they were systematically deprived of the most fundamental rights to which a state's nationals and citizens are entitled, including the right to exist." Pls.' Reply Br. 11, *Simon I*, 812 F.3d 127 (D.C. Cir. 2016) (No. 14-7082), 2014 WL 6603413, at *11 (emphasis added). In other words, the plaintiffs affirmatively argued in their *Simon I* briefing that

they were substantively stripped of Hungarian nationality. That assertion accords, rather than conflicts, with the Survivors' current denial of their Hungarian nationality. Read in full, the plaintiffs' briefing in *Simon I* thus falls short of advancing a "clearly inconsistent" position. *New Hampshire*, 532 U.S. at 751; *see also id.* (explaining judicial estoppel targets "intentional self-contradiction" (quoting *Scarano v. Cent. R. Co. of N.J.*, 203 F.2d 510, 513 (3d Cir. 1953))).

The district court likewise permissibly weighed the second factor—whether the party "succeeded in persuading a court to accept that party's earlier position," *id.* at 750—against judicial estoppel here, *see Simon-2021*, 579 F. Supp. 3d at 127. As noted, the *Simon* plaintiffs made only an implicit reference to their nationality in relation to the treaty exception in their previous briefing. *See* Pls.' Br. at 11-26, *Simon I*, 812 F.3d 127 (D.C. Cir. 2016) (No. 14-7082), 2014 WL 5035235, at *11-26; Pls.' Reply Br. 3, *Simon I*, 812 F.3d 127 (D.C. Cir. 2016) (No. 14-7082), 2014 WL 6603413, at *3; *cf.* Oral Arg. Tr. 4:20-5:2, *Simon I*, 812 F.3d 127 (D.C. Cir. 2016)). And we had no occasion in *Simon I* to determine the plaintiffs' nationality, given our holding that the treaty provision the defendants invoked as the exclusive remedy for Hungarian nationals was not in any event exclusive. 812 F.3d at 140. On an issue neither contested nor decided in *Simon I*, our assumption then that the plaintiffs were Hungarian nationals and our references to them as such in analyzing the treaty exception are not particularly weighty. *See id.* at 136-40. The *Simon* plaintiffs thus did not in any meaningful sense "succeed[] in persuading" us in *Simon I* that they were Hungarian nationals. *New Hampshire*, 532 U.S. at 750.

Finally, the third factor—the degree to which the party seeking to assert an inconsistent position will derive an unfair advantage if not estopped, *id.* at 751—fails to tip the scales in

favor of estoppel for similar reasons. Given that in *Simon I* the plaintiffs did not affirmatively persuade us of their Hungarian nationality and, moreover, expressly denied legally effective Hungarian nationality in portions of their briefing, any unfairness caused by declining to invoke estoppel is, at most, slight. Additionally, while a party's inconsistent position need not be a "but-for cause of the first tribunal's decision" to warrant estoppel, *Temple Univ. Hosp.*, 929 F.3d at 735, a court may consider the degree to which the party's representation influenced the prior ruling in determining what unfairness, if any, would result from declining to invoke estoppel. As discussed further in Part V, *infra*, our treaty-exception ruling in *Simon I* did not turn on the plaintiffs' nationality. The district court permissibly weighed that consideration against the Hungarian defendants' request. *See Simon-2021*, 579 F. Supp. 3d at 127.

We also conclude that the Czechoslovakian Territory Survivors adequately preserved their claim of Czechoslovakian nationality. *But see* Op. Dissenting in Part, at 5. This case is unlike *Philipp v. Stiftung Preussischer Kulturbesitz*, No. 22-7126, – F.4th –, 2023 WL 4536152 (D.C. Cir. July 14, 2023) (per curiam), in which we held the plaintiffs failed to preserve a claim of non-German nationality. *Id.* at *2. The operative complaint in *Philipp* alleged that two of the individual members of the plaintiff consortium fled Germany for the Netherlands, *see* Second Am. Compl. ¶ 170, *Philipp v. Stiftung Preussischer Kulturbesitz*, No. 1:15-cv-00266-CKK, (D.D.C. Sept. 10, 2021), ECF No. 62, but plaintiffs never intimated until their case reached the Supreme Court that they had thereby become nationals of the Netherlands or of any other state. We accordingly affirmed the district court's holding that any such claim had not been preserved.

Here, in contrast, plaintiffs Bar-Or, Pressburger, Speiser, and Perel each plausibly alleged the minimum requirements for Czechoslovakian nationality in the first amended complaint in 2011, *see Simon* First Am. Compl. ¶¶ 21, 38, 40, 80 (J.A. 104, 108, 109, 118)—allegations they retained in the second amended (currently operative) complaint, and that the district court and we deem adequate to bring their claim within the FSIA expropriation exception. *See infra* pp. 38-39; *Simon-2021*, 579 F. Supp. 3d at 140. Consistent with those allegations, the Czechoslovakian Territory Survivors insisted in their earliest responsive filing in the district court that "not all of the plaintiffs were considered Hungarian citizens when they were deported by Defendants," as many of the deported Jews were "citizens of Rumania, Poland and numerous other neighboring areas." Pls.' Opp'n 3, 17, *Simon v. Republic of Hungary*, No. 1:10-cv-01770-BAH (D.D.C. May 6, 2011), ECF No. 24. And, in their brief to us in *Simon I*, they described themselves as "Jewish Holocaust survivors who, on the threshold of World War II, lived within today's Hungarian borders *or in territory annexed by Hungary in 1938 after Czechoslovakia's dismemberment*." Pls.' Br. 2, *Simon I*, 812 F.3d 127 (D.C. Cir. 2016) (No. 14-7082), 2014 WL 5035235, at *2 (emphasis added). To be sure, the point could have been more distinctly preserved throughout. But, like the district court, *see Simon-2021*, 579 F. Supp. 3d at 123-24, 127-29, we hold it adequately preserved.

With this full picture of the equities in view, we conclude the district court acted within its sound discretion to deny the Hungarian defendants' request to judicially estop the Czechoslovakian Territory Survivors from asserting Czechoslovakian nationality at this stage in the litigation.

B.

We turn next to the Hungarian defendants' assertion that
the district court applied the wrong standard to their motion to
dismiss the Czechoslovakian Territory Survivors' claims under
the expropriation exception. According to the Hungarian
defendants, the Supreme Court's decision in *Bolivarian
Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*
(*Helmerich*), 581 U.S. 170 (2017), "raised the bar to establish
jurisdiction under the FSIA," because, they argue, it displaced
for FSIA claims the ordinary plausible-pleading standard
otherwise applicable on a motion to dismiss. Hungary Br. 20;
*see also id.* at 20-21. The Survivors reject that argument as
misconstruing *Helmerich*. They argue that, in view of
sovereign nations' general immunity from suit, *Helmerich* held
inapplicable under the FSIA only the low jurisdictional
threshold of *Bell v. Hood*, 327 U.S. 678 (1946). In other words,
*Helmerich* did not make an exception to the ordinary pleading
requirements of Rule 8(a) as interpreted in *Bell Atlantic Corp.
v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556
U.S. 662 (2009). To establish federal question jurisdiction
under 28 U.S.C. § 1331, *Bell v. Hood* merely requires a legally
nonfrivolous claim, whereas *Helmerich* held that plaintiffs
must state a legally valid claim as a basis for jurisdiction under
the FSIA. We hold that the district court correctly applied the
ordinary plausible-pleading standard we have consistently
applied in FSIA cases, including *Simon I*, which the Supreme
Court's decision in *Helmerich* left undisturbed.

As a threshold matter, the Survivors claim the Hungarian
defendants forfeited their *Helmerich* argument. Assuming that
objections to subject matter jurisdiction under the FSIA are
forfeitable, we exercise our discretion to reach the Hungarian
defendants' *Helmerich* argument. We typically review
forfeited arguments "only in exceptional circumstances, as, for

example, in cases involving uncertainty in the law [or] novel, important, and recurring questions of federal law." *Flynn v. Comm'r*, 269 F.3d 1064, 1069 (D.C. Cir. 2001). This case presents such circumstances. *Helmerich* arguably has introduced "uncertainty in the law" governing motions to dismiss on foreign sovereign immunity grounds, and the Hungarian defendants' novel heightened pleading theory is both important and likely to recur in future FSIA cases. *Id.* The question is squarely presented and amply briefed in this case, and we would be remiss if we did not resolve it.

We conclude *Helmerich* did not disturb the plausible-pleading standard that we employed in *Simon I*. Rather, *Helmerich* rejected the "nonfrivolous-argument standard" that we had applied to the legal theory on which a plaintiff might depend to establish jurisdiction under the FSIA in *Helmerich I*. *Helmerich*, 581 U.S. at 187; s*ee id.* at 173-74, 177-83; *Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela* (*Helmerich I*), 784 F.3d 804, 811-12 (D.C. Cir. 2015).

In our vacated *Helmerich* decision, we held that we would grant a motion "on the grounds that the plaintiff has failed to plead a 'taking in violation of international law' or has no 'rights in property . . . in issue' *only* if the claims are 'wholly insubstantial or frivolous.'" 784 F.3d at 812 (quoting *Agudas Chasidei Chabad of U.S. v. Russian Fed'n*, 528 F.3d 934, 943 (D.C. Cir. 2008)); *see also id.* at 811 (quoting *Bell*, 327 U.S. at 682). The legal issue before us was whether a Venezuela-incorporated, wholly owned subsidiary of a U.S. company could invoke the FSIA's expropriation exception to sue the Venezuelan government. *See id.* at 812. Venezuela argued that the suit was barred because the subsidiary should be treated as a Venezuelan national, bringing the alleged taking within the domestic takings rule's scope. *Id.* The plaintiffs countered that

international law recognizes an exception to that rule when a sovereign unreasonably discriminates based on a company *shareholder's* nationality in expropriating that company's property. *Id*. at 812-13. The parties also disputed whether the U.S. parent company had property rights in the subsidiary that were cognizable under international law. *Id.* at 814. We acknowledged that the plaintiffs had advanced novel legal theories to support their invocation of the FSIA's expropriation exception, but in denying defendants' motion to dismiss for lack of jurisdiction we did not decide whether those theories were valid. *See id.* at 812-16. Instead, we denied the motion because we thought it sufficed that the plaintiffs had "asserted a non-frivolous international expropriation claim" and had "put [their] rights in property in issue in a non-frivolous way." *Id.* at 812 (quoting *Chabad*, 528 F.3d at 941); *see id.* at 813, 816.

The Supreme Court vacated that ruling. It held that "a party's nonfrivolous, but ultimately incorrect, argument that property was taken in violation of international law is insufficient to confer jurisdiction" under the FSIA. *Helmerich*, 581 U.S. at 174. Rather, the complaint must make "a legally valid claim that a certain kind of right is at issue (property rights) and that the relevant property was taken in a certain way (in violation of international law)." *Id.* (emphasis omitted). The Supreme Court took issue with our decision to confirm the district court's jurisdiction because "the plaintiffs *might* have such a claim," requiring instead that courts decide at the jurisdictional threshold whether plaintiffs actually have a claim that is legally cognizable under the FSIA. *Id.* at 177. The Court found no support in the text, history, and purpose of the FSIA for permitting courts to exercise jurisdiction over a foreign sovereign "where there is a nonfrivolous but ultimately *incorrect* argument that the taking violates international law." *Id.* at 182; *see id.* at 176-83, 187.

In holding the nonfrivolous-argument standard inapplicable to the FSIA, *Helmerich* did not alter the plausible-pleading standard. The Hungarian defendants conflate the distinct issues of the validity of a legal theory and the standard for assessing factual allegations in a complaint. As the Supreme Court has made clear in other contexts, the plausible-pleading standard clarified in *Twombly* and *Iqbal* "concern[s] the *factual* allegations a complaint must contain to survive a motion to dismiss," *Johnson v. City of Shelby*, 574 U.S. 10, 12 (2014) (per curiam), not the degree to which plaintiffs' *legal* theories must be correct on their merits. *Helmerich* thus did not create a heightened pleading standard. Contrary to the Hungarian defendants' argument, nothing in *Helmerich* affects the familiar standard we have consistently applied to review the plaintiffs' factual allegations in FSIA cases like *Simon I*.

Indeed, prior to *Helmerich*, it was our longstanding practice to apply the plausible-pleading standard to resolve motions to dismiss on FSIA grounds where a defendant challenges only the legal sufficiency of a plaintiff's allegations. *See, e.g.*, *Price*, 389 F.3d at 194, 197; *Rong v. Liaoning Province Gov't*, 452 F.3d 883, 885 n.2, 888 (D.C. Cir. 2006); *Simon I*, 812 F.3d at 147. And our rulings following *Helmerich* have, correctly, continued to apply the plausible-pleading standard in that context. *See, e.g.*, *Ivanenko*, 995 F.3d at 236; *Valambhia v. United Republic of Tanzania*, 964 F.3d 1135, 1139 (D.C. Cir. 2020); *Schubarth v. Fed. Republic of Germany*, 891 F.3d 392, 398-99 (D.C. Cir. 2018); *EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.*, 894 F.3d 339, 345 (D.C. Cir. 2018).

Finding no support in our precedent, the Hungarian defendants turn to *Rukoro v. Federal Republic of Germany*, 976 F.3d 218 (2d Cir. 2020). But *Rukoro* does not bind us, and to the extent it is inconsistent with our approach, we believe it

is incorrect. *Rukoro* reads *Helmerich*'s requirement of "a legally valid claim" to have, *sub silentio*, adopted for purposes of FSIA claims a heightened standard of pleading, beyond the Rule 8(a) "plausibility standard" as clarified in *Twombly* and *Iqbal*. *Id.* at 224-25. In so doing, *Rukoro* erroneously implies that *Helmerich*'s requirement of a legally valid (not just nonfrivolous) legal theory equates to a more demanding standard of pleading. *See id.* at 225 ("Such allegations may satisfy a plausibility standard, but not a valid argument standard."). The Second Circuit in *Rukoro* acknowledged that it thereby departed from our approach in *Simon I*—a departure it viewed as required by the Supreme Court's ensuing decision in *Helmerich*. *Id.* (citing *Simon I*, 812 F.3d at 147). Because we conclude *Helmerich* left the generally applicable plausible-pleading standard undisturbed, we affirm the district court's adherence to it.

In short, we hold that the plausible-pleading standard that we applied in *Simon I* remains good law post-*Helmerich*. The Hungarian defendants challenge the adequacy of the Czechoslovakian Territory Survivors' factual allegations—and specifically, whether the pleadings plausibly allege facts that support their alleged Czechoslovakian nationality, and hence that their property was taken "in violation of international law." 28 U.S.C. § 1605(a)(3). The district court was correct to apply the plausible-pleading standard articulated in *Simon I*. We must adhere to that same standard in our *de novo* review of the Survivors' nationality allegations, to which we now turn.

C.

Although the Survivors who claim statelessness cannot prevail, we conclude that a subset of the Survivors who assert Czechoslovakian nationality are entitled to proceed in the litigation.

Recall that the district court denied the defendants' motion to dismiss the claims of nine of the Czechoslovakian Territory Survivors: Magda Kopolovich Bar-Or, Yitzhak Pressburger, Alexander Speiser, Moshe Perel, and the five Lebovics sisters. *See Simon-2021*, 579 F. Supp. 3d at 131-35, 140-41. The court dismissed the claims of one of the Czechoslovakian Territory Survivors (Ze'ev Tibi Ram) without prejudice to his right to replead and dismissed the claims of the other two (Tzvi Zelikovitch and Ella Feuerstein Schlanger) with prejudice. *See id.* at 140.

The Hungarian defendants challenge the district court's decision not to dismiss nine of the Czechoslovakian Territory Survivors' claims. They argue that, even assuming the plausible-pleading standard applies, those Survivors failed to adequately allege that they were Czechoslovakian nationals at the time of the takings. Absent such allegations, they contend, the Survivors have not pleaded that their property was "taken in violation of international law" for purposes of the FSIA's expropriation exception. 28 U.S.C. § 1605(a)(3).

On cross-appeal, the Survivors challenge the district court's dismissal of Schlanger and Zelikovitch's claims for failing to plausibly allege Czechoslovakian nationality. They argue that the district court overlooked relevant allegations and filings in the record that demonstrate both were Czechoslovakian nationals at the time of the takings.

We review *de novo* the district court's jurisdictional rulings on the adequacy of the Czechoslovakian Territory Survivors' allegations under the plausible-pleading standard. *See Schubarth*, 891 F.3d at 398. We conclude that four of the Czechoslovakian Territory Survivors—Bar-Or, Pressburger, Speiser, and Perel—are entitled to proceed in the litigation. However, we direct the district court to dismiss the claims of

the five Lebovics sisters, Zelikovitch, and Schlanger without prejudice.

1.

We begin by deciding which body of law governs the question: international or domestic law. "[W]hile it is for each state to determine under its own law who are its nationals, such law must be recognised by other states only 'in so far as it is consistent with international conventions, international custom, and the principles of law generally recognised with regard to nationality.'" 1 Oppenheim's International Law § 378 (Sir Robert Jennings & Sir Arthur Watts eds., 9th ed. 1996) (quoting Hague Convention of 1930 on Certain Questions Relating to the Conflict of Nationality Laws art. I, Apr. 12, 1930, 179 L.N.T.S. 89); *see also* Oliver Dörr, *Nationality*, Max Planck Encyclopedias of International Law ¶ 4 (recognizing that "international law limits [the] discretion" of a state to "determine under its own law who are its nationals" for purposes of "acceptance on the international plane"); *Nottebohm Case*, 1955 I.C.J. Rep. at 23 ("[A] State cannot claim that the rules it has . . . laid down are entitled to recognition by another State unless it has acted in conformity with [international principles governing nationality].").

As relevant here, treaties executed at the close of World War I established international obligations regarding the nationality of persons living in territory transferred from the Austro-Hungarian Empire to the newly created Czechoslovakian state. The 1919 Treaty of St. Germain, executed between the Allied and Associated Powers and Czechoslovakia, imposed international obligations on Czechoslovakia to confer nationality on certain persons within Czechoslovakia's new borders. *See* St. Germain Treaty arts. 3-6. The 1920 Treaty of Trianon, which ended World War I

hostilities between Hungary and the Allied and Associated Powers, also established rules to govern the nationalities of individuals living in the newly formed Czechoslovakian state. *See* Treaty of Trianon arts. 61-66, 213.

Accordingly, in this circumstance, we look first to international law to determine the Survivors' nationality status. Czechoslovakian and Hungarian state law governing nationality remains relevant, but only "in so far as it is consistent with" the international legal obligations set forth in the Treaty of St. Germain and the Treaty of Trianon. 1 Oppenheim's International Law § 378 (quoting Hague Convention of 1930 art. I).

## 2.

Within that framework, we examine whether the Survivors have plausibly alleged Czechoslovakian nationality, thereby bringing their claims outside the scope of the domestic takings rule. Because the Hungarian defendants' position "amounts to a challenge to the legal sufficiency of the allegations . . . we must thus 'decide *de novo* whether the alleged jurisdictional facts are sufficient to divest the foreign sovereign of its immunity." *Mwani v. bin Laden*, 417 F.3d 1, 15-16 (D.C. Cir. 2005) (formatting modified) (quoting *Price*, 389 F.3d at 197). Dismissal is warranted only if no plausible inferences can be drawn from the facts alleged that, if proven, would bring plaintiffs' claims within an exception to sovereign immunity under the FSIA. *Schubarth*, 891 F.3d at 398. We must accept as true the allegations in the complaint and grant the survivors the benefit of all reasonable inferences that can be derived from the facts alleged. *See id.* at 400-01.

The district court observed that Bar-Or, Pressburger, Speiser, and Perel, each alleged that in the 1920s or 1930s they were born in Czechoslovakian territory to parents "not known

to be of Hungarian nationality." *Simon-2021*, 579 F. Supp. 3d at 121 (citing Pls.' Opp'n 4). From that fact, the district court inferred that those Survivors' parents also lived for a sufficient period of time in territory that later became Czechoslovakia, so meet the requirements for citizenship under Czechoslovakian domestic law. *See Simon-2021*, 579 F. Supp. 3d at 131, 133-35. The court therefore concluded that Bar-Or, Pressburger, Speiser, and Perel had each plausibly alleged Czechoslovakian nationality.

We agree with the district court's conclusion as to those four Survivors, though for different reasons. Bar-Or, Pressburger, Speiser, and Perel each allege the minimum requirements for Czechoslovakian citizenship under the 1919 St. Germain Treaty. Article 6 of that Treaty provides that "[a]ll persons born in Czecho-Slovak territory who are not born nationals of another State shall *ipso facto* become Czecho-Slovak nationals." St. Germain Treaty art. 6. That provision requires that the Survivors have been born in Czechoslovakia after its formation, which is precisely what those four plaintiffs allege. Bar-Or "was born in 1928 in Korosmezo (Jasina), in Hungarian-annexed Ruthenia (formerly Austria-Hungary, then Czechoslovakia and now Ukraine)." *Simon* SAC ¶ 22 (J.A. 242). Pressburger "was born in Prague in 1933." *Id.* ¶ 39 (J.A. 246). Speiser "was born on October 12, 1928, in Ersekujvar, Czechoslovakia." *Id.* ¶ 41 (J.A. 247). And Perel "was born in Ersekujvar [Czechoslovakia] . . . on February 7, 1927." *Id.* ¶ 81 (J.A. 256). Those Czechoslovakian Territory Survivors have thereby adequately alleged Czechoslovakian nationality. We accordingly affirm the district court's denial of the defendants' motion to dismiss their claims.

As for the Lebovics sisters, we reverse. The district court erroneously concluded that the sisters' plausible allegation that they were "raised in Tarackoz in Hungarian-annexed

Ruthenia," *Id.* ¶ 10 (J.A. 239), supports an inference that they were Czechoslovakian nationals at the time of the alleged takings, *see Simon-2021*, 579 F. Supp. 3d at 131-32. Not so. Being "raised" in Czechoslovakian territory is insufficient, even under the St. Germain Treaty, to plausibly allege Czechoslovakian nationality because we cannot reasonably infer from that allegation that the sisters were born there; being "raised" in a place is distinct from being "born" there, as the district court itself noted. *See id.* at 132. Although the pleadings do not specify the Lebovics sisters' place and date of birth, the Survivors' counsel stated at oral argument that they were all "born in Czechoslovakia" after its formation. Oral Arg. 47:36-39; *see id.* at 47:06-36. Therefore, because it appears the five Lebovics sisters may be able to cure the jurisdictional defects in their complaint, we direct the district court to dismiss their claims without prejudice.

Finally, we reject the defendants' argument that the Czechoslovakian Territory Survivors were required to obtain a permit to acquire Czechoslovakian nationality pursuant to Article 62 of the Trianon Treaty. The Survivors assert that the defendants forfeited this argument because they did not raise it before the district court. We nevertheless exercise our discretion to address this issue on appeal. The defendants' reading of the Trianon Treaty does not withstand close scrutiny. First, the permit requirement in Article 62 covers a limited category of individuals that does not include the Czechoslovakian Territory Survivors. To understand Article 62's scope, we begin with the provision it modifies: Article 61.

Article 61 of the 1920 Trianon Treaty assigned new nationalities to citizens of the former Austro-Hungarian Empire. It provides:

> Every person possessing rights of citizenship . . . in territory which formed part of the territories of the former Austro-Hungarian Monarchy shall obtain *ipso facto* to the exclusion of Hungarian nationality the nationality of the State exercising sovereignty over such territory.

Treaty of Trianon art. 61. Article 61 thus grants Czechoslovakian nationality to citizens of any territory of the Austro-Hungarian Monarchy that was transferred to the newly formed Czechoslovakian state. *See id.*

Article 62 then limits the scope of Article 61's reassignment of nationalities. It states:

> Notwithstanding the provisions of Article 61, persons who acquired rights of citizenship after January 1, 1910, in territory transferred under the present Treaty to [Czechoslovakia], will not acquire [Czechoslovakian] nationality without a permit from the [Czechoslovakian] State . . . .

*Id.* art. 62. Read in context with Article 61, the phrase "persons who acquired rights of citizenship after January 1, 1910, in territory transferred under the present Treaty to [Czechoslovakia]," refers to persons who acquired citizenship in the *Austro-Hungarian* Empire after 1910 in the territories that were "transferred" to Czechoslovakia in 1918; it does not refer more broadly to all persons who acquired *Czechoslovakian* citizenship after January 1, 1910. *Id.* Indeed, Czechoslovakia did not exist as an independent state until 1918 so it would have been impossible for an individual to acquire Czechoslovakian citizenship between 1910 and 1918.

Accordingly, we read Article 62's permit requirement to cover those who acquired citizenship in the Austro-Hungarian Empire in the window after January 1910 and before the formation of Czechoslovakia in 1918—in other words, late-arriving Austro-Hungarian citizens without deep roots in the territory that became Czechoslovakia. *See* Treaty of Trianon art. 62. Because Bar-Or, Pressburger, Speiser, and Perel each allege that they were born after 1920, *see Simon* SAC ¶¶ 22, 39, 42, 81 (J.A. 242, 246-47, 256)—and because the Lebovics sisters may amend to allege as much, *see* Oral Arg. 47:06-38—they do not fall into the category of persons covered by the permit requirement in Article 62 of the Trianon Treaty.

Second, and in any event, even if the defendants' reading of Article 62 were correct, Article 65 of the Trianon Treaty expressly preserves rights to choose any other nationality available under earlier treaties between the Allied and Associated Powers and Czechoslovakia. *See* Treaty of Trianon art. 65. Specifically, Article 65 provides that the Treaty of Trianon does not limit the ability of persons it covers to "choose any other nationality which may be open to them" pursuant to other treaties "concluded . . . between any of the Allied and Associated Powers themselves," including the St. Germain Treaty. *Id.* Therefore, even assuming the permit requirement in Article 62 of the Trianon Treaty applied to the Survivors, it would not have eliminated the option to accept Czechoslovakian nationality available to the Survivors under Article 6 of the St. Germain Treaty.

Before proceeding, we acknowledge that the Survivors did not draw on the St. Germain Treaty in support of their nationality claims before the district court. Nor did the district court consider it. *See Simon-2021*, 579 F. Supp. 3d at 129-35. Ordinarily, we refrain from "consider[ing] an issue not passed upon below." *Liff v. Off. of the Inspector Gen. for the U.S.*

*Dep't of Lab.*, 881 F.3d 912, 919 (D.C. Cir. 2018) (quoting *Singleton v. Wulff*, 428 U.S. 106, 120 (1976)). However, we have discretion to do so "as may be justified by the [circumstances] of individual cases." *Id.* We elect to exercise that discretion here. Interpreting Article 6 of the St. Germain Treaty and understanding how it operates in the context of the Czechoslovakian Territory Survivors' nationality claims does not require any fact finding or "depend on any additional facts not considered by the district court," *id.* (quoting *Roosevelt v. E.I. Du Pont de Nemours & Co.*, 958 F.2d 416, 419 n.5 (D.C. Cir. 1992)), as demonstrated by the preceding analysis. Addressing the Survivors' arguments under the St. Germain Treaty also "avoids unnecessary expenditure of judicial resources and expedites final resolution of the parties' dispute." *Id.*

3.

That brings us to the Survivors' cross appeal. They contend that the district court erred in dismissing the claims of Tzvi Zelikovitch and Ella Feuerstein Schlanger. We affirm the district court's dismissal of those two Survivors' claims. However, we conclude the district court should have dismissed their claims without prejudice.

As they stand, the allegations in the Second Amended Complaint fail to push Zelikovitch and Schlanger's nationality claims across the line from conceivable to plausible. Recall that Article 6 of the St. Germain Treaty provides "[a]ll persons born in Czecho-Slovak territory *who are not born nationals of another State* shall *ipso facto* become Czecho-Slovak nationals." St. Germain Treaty art. 6 (emphasis added). Accordingly, if Zelikovitch and Schlanger were born nationals of another state (*e.g.*, by descent), even proof that they were

born in Czechoslovakian territory would not, per Article 6, have made them Czechoslovakian nationals. *See id.*

Although the Second Amended Complaint alleges that Zelikovitch and Schlanger were each born in Czechoslovakian territory, the pleadings also suggest that they may have been born nationals of another State—namely, Hungary. *See Simon* SAC ¶¶ 15, 73 (J.A. 240, 254). According to the Survivors, and as summarized by the district court, under Hungarian law at the time, "one acquired Hungarian citizenship . . . by descent from a citizen parent." *Simon-2021*, 579 F. Supp. 3d at 120 (quoting Pls.' Opp'n 25-26). And the pleadings provide reason to believe Zelikovitch and Schlanger's parents may have been Hungarian citizens at the time of Zelikovitch and Schlanger's births. As for Zelikovitch, the Second Amended Complaint alleges that his parents were "both *Hungarian citizens*." *Simon* SAC ¶ 15 (J.A. 240) (emphasis added). With respect to Schlanger, the pleadings allege she was "born in 1930 to a *Hungarian* family resident in Benedike, Czechoslovakia, approximately 10 km from Munkács." *Id.* ¶ 73 (J.A. 254) (emphasis added). In light of those allegations, we cannot conclude that it is plausible, as opposed to merely possible, that Zelikovitch and Schlanger acquired Czechoslovakian nationality per Article 6 of the St. Germain Treaty upon birth. The district court therefore correctly granted the defendants' motion to dismiss the claims of Zelikovitch and Schlanger.

That leaves the question whether the district court correctly dismissed their claims with prejudice. The "standard for dismissing a complaint with prejudice is high." *Rudder v. Williams*, 666 F.3d 790, 794 (D.C. Cir. 2012) (quoting *Belizan v. Hershon*, 434 F.3d 579, 583 (D.C. Cir. 2006)). Dismissal with prejudice is warranted when "the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Id.* (quoting *Belizan,* 434 F.3d at 583); *accord*

*Abbas v. Foreign Pol'y Grp., LLC*, 783 F.3d 1328, 1340 (D.C. Cir. 2015).

Here, it is possible that Zelikovitch and Schlanger could allege facts consistent with the Second Amended Complaint that would support their claims of Czechoslovakian nationality. Schlanger's allegation that she was born to a "Hungarian family," *Simon* SAC ¶ 73 (J.A. 254), does not necessarily mean that her parents were Hungarian citizens at the time of her birth. And, in their briefing, the Survivors state that the complaint should have read "Hungarian-*speaking*" family. Survivors' Br. 40 n.26 (emphasis added). If the Survivors were able to amend the complaint to clarify, for example, that Schlanger's parents were not Hungarian citizens but only Hungarian speakers at the time of her birth, the pleadings would thereby plausibly allege that Schlanger acquired Czechoslovakian nationality at birth under Article 6 of the St. Germain Treaty. *See* St. Germain Treaty art. 6.

Similarly, the relevant allegations and filings in the record regarding Zelikovitch leave open the possibility that he did not inherit Hungarian nationality from his parents, and thus would have acquired Czechoslovakian nationality upon birth. Although Zelikovitch's parents may have been "Hungarian citizens" prior to the creation of Czechoslovakia, *Simon* SAC ¶ 15 (J.A. 240), there is reason to believe his parents may have become Czechoslovakian nationals upon that country's formation. Pursuant to Article 3 of the St. Germain Treaty, Czechoslovakia agreed to confer Czechoslovakian nationality on all "Hungarian nationals" who were, as of the Treaty's effective date, "habitually resident or possessing the rights of citizenship . . . in territory which is or may be recognised as forming part of Czechoslovakia." St. Germain Treaty art. 3. Zelikovitch's father was born in 1895 in Uglya, an Austro-Hungarian region that became part of Czechoslovakia upon the

country's formation. *See* Zelikovitch Decl. ¶¶ 5-6 (J.A. 226); *Simon* SAC ¶ 15 (J.A. 240). And, as of 1928, Zelikovitch's entire family was living in Uglya, where his father was a "prosperous blacksmith." *Simon* SAC ¶ 15 (J.A. 240). Those allegations raise the possibility that Zelikovitch's parents were residents of Uglya at the time of Czechoslovakia's formation in 1918. If that is the case, Zelikovitch's parents likely would have acquired Czechoslovakian citizenship in 1918 unless they affirmatively chose another citizenship. *See* St. Germain Treaty arts. 3, 5. Accordingly, it remains possible that Zelikovitch could cure the deficiency by alleging facts consistent with the Second Amended Complaint that would support the inference that his parents were not in fact Hungarian nationals at the time of his birth, even if they were Austro-Hungarian nationals before the creation of Czechoslovakia. Dismissal without prejudice was thus warranted as to both Zelikovitch and Schlanger.

\* \* \*

To sum up, four of the twelve Czechoslovakian Territory Survivors adequately alleged they were Czechoslovakian at the time of the takings and thus those claims survive dismissal. We reverse the decision to allow the claims of the five Lebovics sisters to proceed as alleged and affirm the dismissal of the claims of Zelikovitch and Schlanger. However, we hold that those seven plaintiffs should be permitted to amend their pleadings if they have evidentiary support enabling them, consistent with applicable requirements, to cure the identified shortcomings. *See* Fed. R. Civ. P. 11(b)(3).

IV.

As an alternative to their nationality-based arguments that the domestic takings rule does not bar their claims, the Survivors invoke the 1920 Treaty of Trianon as an independent

basis for demonstrating a "tak[ing] in violation of international law" for purposes of the expropriation exception. 28 U.S.C. § 1605(a)(3). Their argument proceeds in two steps. First, they contend that a "violation of the Trianon Treaty is a violation of international law within the scope of the expropriation exception." Survivors' Br. 27. Second, they claim Hungary violated the Trianon Treaty—and specifically, provisions guaranteeing religious free exercise and equal protection under the law without regard to race or religion—by "target[ing] for persecution, exploitation, and property expropriation its Jewish inhabitants, including Survivors[,] whether or not they were Hungarian nationals." *Id*. at 29.

The Survivors' argument fails at step one. Recall *Philipp* held that only violations of "the international law of expropriation" count for purposes of the FSIA's expropriation exception. 141 S. Ct. at 715. The treaty provisions that the Survivors claim Hungary breached—Articles 55 and 58 of the Treaty of Trianon—do not fit that description.

As noted, the 1920 Treaty of Trianon is the peace treaty that formally concluded hostilities between Hungary and the Allied and Associated Powers in World War I. *See* Treaty of Trianon, preamble. The Treaty addresses a broad range of issues related to the end of hostilities, including Hungary's post-war borders, *id.* arts. 27-35; Hungary's recognition of the newly independent states of Yugoslavia and Czechoslovakia, *id.* arts. 41-44, 48-52; demobilization of Hungary's military forces, *id.* arts. 102-43; and penalties and reparations Hungary owed to the Allied and Associated Powers, *id.* arts. 157-74. While some provisions of the Treaty reference property, *see, e.g.*, *id.* arts. 212, 232(1)(e), the Treaty as a whole is not focused on property rights or state takings. And the Survivors do not meaningfully contend that the Treaty of Trianon as a whole is part of the "international

law of expropriation." *Philipp*, 141 S. Ct. at 715. The Survivors must therefore advance a valid argument that the specific provisions they allege Hungary breached, Articles 55 and 58, are correctly characterized as international law of expropriation.

The Survivors have failed to do so. "The interpretation of a treaty . . . begins with its text." *Medellín v. Texas*, 552 U.S. 491, 506 (2008). Here, the text of the Treaty belies the Survivors' characterization of Articles 55 and 58 as "international law of expropriation." *Philipp*, 141 S. Ct. at 715. Neither provision relied on by the Survivors even mentions property or takings. Rather, both provisions govern "protection of minorities" in post-war Hungary. Treaty of Trianon pt. III § IV (capitalization altered). Article 55 requires Hungary to "assure full and complete protection of life and liberty to all inhabitants of Hungary without distinction of birth, nationality, language, race or religion," and establishes that "[a]ll inhabitants of Hungary shall be entitled to the free exercise, whether public or private, of any creed, religion or belief whose practices are not inconsistent with public order or public morals." *Id.* art. 55. The provision of Article 58 on which the Survivors rely establishes similar protections for minorities. It mandates that "Hungarian nationals who belong to racial, religious or linguistic minorities shall enjoy the same treatment and security in law and in fact as the other Hungarian nationals." *Id.* art. 58.

The absence of any mention of property in Articles 55 and 58—which protect Hungarian inhabitants and nationals—is notable given that other provisions of the Trianon Treaty explicitly address property rights of foreign nationals. *See, e.g.*, *id.* arts. 212, 232. Article 232, for instance, situated within the Treaty section titled "Property, Rights and Interests," provides "[t]he nationals of Allied and Associated Powers shall

be entitled to compensation in respect of damage or injury inflicted upon their property, rights or interests." *Id.* art. 232(e). Article 212 similarly establishes that "[t]he nationals of the Allied and Associated Powers shall enjoy in Hungarian territory a constant protection for their persons and for their property, rights and interests." *Id.* art. 212. These provisions show the drafters of the Trianon Treaty specifically considered property rights and state takings elsewhere in the Treaty, but chose not to address property rights in Articles 55 and 58. The text of the Treaty thus provides strong evidence that its drafters did not intend Articles 55 and 58 to impose on Hungary international-law obligations related to takings of its own nationals' property—undercutting the Survivors' claim that those provisions fall within the international law of expropriation or, as the *Philipp* Court also called it, the international "law of property." 141 S. Ct. at 712.

The Survivors counter that the provisions in Articles 55 and 58 mandating equal treatment of Hungarian nationals regardless of race or religion necessarily encompass protections for property rights and are therefore part of the international law of expropriation. That argument proves too much. The same could be said of many principles of human rights law—*i.e.*, that they encompass protections for property rights. Take, for instance, the prohibition on "systematic racial discrimination" recognized by customary international human rights law. Third Restatement § 702(f). That principle presumably protects against systematic property takings on the basis of race conducted "as a matter of state policy." *Id.* § 702 cmt. i. But that does not make that rule of customary human rights law, any more than the law against genocide, a source of international law under *Philipp* that could support a claim under the FSIA's expropriation exception. *See* 141 S. Ct. at 712. *Philipp* instructs that plaintiffs must show that the international legal obligation on which they rely falls within

the "international law of expropriation *rather than* of human rights." *Id.* (emphasis added). On that score, the Survivors come up short. Given the lack of any reference to property in Articles 55 and 58, in contrast to other provisions of the Trianon Treaty, we conclude that the Survivors have failed to advance a viable argument that those Articles constitute "international law of expropriation" for purposes of the FSIA's expropriation exception. *Id.* at 715.

There is no question that Hungary's persecution of its Jewish population during the Holocaust breached its obligations under Articles 55 and 58 of the Treaty of Trianon. But the Survivors have failed to demonstrate that Hungary's alleged breach of the Trianon Treaty amounted to a "violation of international law" within the meaning of the FSIA's expropriation exception. *See Philipp*, 141 S. Ct. at 715.

V.

We turn next to the Hungarian defendants' argument that, even assuming the Survivors were non-Hungarian nationals at the time of the alleged takings, their claims are barred by the FSIA's "treaty exception." That exception is codified in Title 28, Section 1604, which provides that the FSIA's baseline grant of immunity to foreign sovereigns is "[s]ubject to existing international agreements to which the United States [was] a party at the time of enactment of th[e] Act." 28 U.S.C. § 1604. The "exception applies when international agreements 'expressly conflict' with the immunity provisions of the FSIA." *Amerada Hess*, 488 U.S. at 442 (formatting modified) (quoting H.R. Rep. No. 94-1487, at 17 (1976); S. Rep. No. 94-1310, at 17 (1976)). Under the exception, "if there is a conflict between the FSIA and such an agreement regarding the availability of a judicial remedy against a contracting state, the

agreement prevails." *de Csepel II*, 859 F.3d at 1100 (quoting *de Csepel I*, 714 F.3d at 601).

The Hungarian defendants' claim to immunity under the treaty exception rests on the 1947 Treaty of Peace, which formally established peaceful relations between Hungary and the Allied and Associated Powers following World War II. *See Simon I*, 812 F.3d at 136. According to the defendants, the 1947 Treaty provides "the exclusive means for non-Hungarian claimants to recover from Hungary for wartime property losses," thereby barring any non-Hungarian Survivors from proceeding under the FSIA pursuant to the treaty exception. Hungary Br. 30.

Two provisions of the 1947 Treaty are relevant here: Articles 26 and 27. The former requires Hungary to "restore all legal rights and interests in Hungary of the United Nations and their nationals as they existed on September 1, 1939," and to "return all property in Hungary of the United Nations and their nationals as it now exists." 1947 Treaty art. 26(1). Article 26 further provides that, "[i]n cases where the property has not been returned within six months from the coming into force of the present Treaty, application shall be made to the Hungarian authorities not later than twelve months from the coming into force of the Treaty," except in certain cases. *Id.* art. 26(2). Article 26 defines covered "United Nations nationals" as "individuals who [we]re nationals of any of the United Nations . . . at the coming into force of the present Treaty," which included Czechoslovakia, and all persons who, "under the laws in force in Hungary during the war, ha[d] been treated as enemy." *Id.* art. 26(9)(a). Article 27, for its part, requires Hungary to provide restoration of (or compensation for) property that the Hungarian government seized during the war from "persons under Hungarian jurisdiction" whom Hungary

subjected to such seizures "on account of the[ir] racial origin or religion." *Id.* art. 27(1).

The defendants acknowledge we already rejected their argument that Article 27 of the 1947 Treaty forecloses extra-treaty means of recovery. *See* Hungary Br. 28-29; *Simon I*, 812 F.3d at 140; *see also Simon-2021*, 579 F. Supp. 3d at 127 n.26 (D.D.C. 2021) (declining to revisit the treaty exception). In *Simon I*, we held that "Article 27 secures one means by which Hungarian victims can seek recovery against Hungary for their wartime property losses, but not to the exclusion of other available remedies." 812 F.3d at 140. We therefore concluded the defendants had failed to identify an "express conflict between an 'existing international agreement[]' and the FSIA's other immunity exceptions for purposes of the FSIA's treaty exception." *Id.* (quoting 28 U.S.C. § 1604).

The Hungarian defendants claim our *Simon I* ruling poses no obstacle to their renewed treaty-exception argument. They argue that, if the Survivors were *non*-Hungarian nationals at the time of the alleged takings, then Article 26, rather than Article 27, of the 1947 Treaty would apply to their claims. And Article 26, the defendants argue, provides the exclusive means by which non-Hungarians may seek compensation for property taken from them by Hungary during World War II, thereby barring the Survivors from proceeding under the FSIA.

The Hungarian defendants' argument falters at the outset. Their threshold claim—that Article 26 alone covers the Survivors' property losses if they are indeed non-Hungarian nationals—is belied by the text of the 1947 Treaty. By its plain terms, Article 27 also applies. It establishes a restoration-or-compensation scheme for property seized by the Hungarian government during the war from "persons under Hungarian jurisdiction" who were targeted on account of their race or

religion. 1947 Treaty art. 27(1). It nowhere limits its coverage to *Hungarian nationals* under Hungarian jurisdiction. *See id.* Other provisions of the Treaty confirm that its drafters distinguished between "persons under Hungarian jurisdiction" and "Hungarian nationals." Article 2, for instance, provides different protections in its first and second clauses for "persons under Hungarian jurisdiction" as compared to "persons of Hungarian nationality." *Id.* art. 2(1)-(2); *see also, e.g.*, *id.* arts. 26(4), 29(1), 29(3)-(5), 30(1)-(2), 30(4), 32(1), 32(3) (using the phrase "Hungarian nationals"). Because there is no dispute that the Survivors were in territory annexed by Hungary and thereby "under Hungarian jurisdiction," nor is there any dispute the Survivors adequately allege that Hungary seized the Survivors' property on account of their religion, Article 27 applies to their claims irrespective of their status as non-Hungarian nationals. *Id.* art. 27(1).

That raises the question, however, whether Article 27 as applied to *non*-Hungarian nationals provides the exclusive means for such persons to obtain recovery for Hungary's seizure of their property during the war. As noted, our ruling in *Simon I* assumed that the plaintiffs were Hungarian nationals for purposes of the treaty-exception inquiry. *See* 812 F.3d at 136-40. We conclude, however, that our reading of the Treaty's text in *Simon I* holds as applied to claims brought by non-Hungarian nationals.

As we explained in *Simon I*, "[t]he terms of Article 27 do not speak in the language of exclusivity." *Id.* at 137. Although Article 27 provides certain rights to victims of the Holocaust regarding property the Hungarian government confiscated, "it says nothing about whether those rights are exclusive of other claims" that covered individuals might bring. *Id.* Other World War II peace treaties, by contrast, contain express waivers of extra-treaty claims. *See id.* at 137-38 (citing Treaty of Peace

with Japan art. 14(a)-(b), Sept. 8, 1951, 3 U.S.T. 3169). And, as we explained, "[t]he absence of any such waiver language in Article 27 is all the more notable given that the 1947 Treaty itself contains an express waiver of certain other claims." *Id.* at 138. Indeed, Article 32 of the 1947 Treaty states that "Hungary waives all claims of any description against the Allied and Associated Powers on behalf of the Hungarian Government or Hungarian nationals arising directly out of the war," 1947 Treaty art. 32(1), but includes no reciprocal waiver of all claims by Allied and Associated Powers or their nationals against Hungary, *see id.* arts. 27, 32. The text of the Treaty thus makes clear that Article 27 does not foreclose extra-treaty claims for covered individuals, including non-Hungarian nationals—and thus does not immunize Hungary from the Survivors' suit under the FSIA's treaty exception. *See Simon I*, 812 F.3d at 140; 28 U.S.C. § 1604.

The same goes for Article 26 of the 1947 Treaty. Like Article 27, Article 26 speaks only to Hungary's obligations to compensate United Nations nationals, as defined by the Treaty. 1947 Treaty art. 26(1), (9). It does not address, let alone foreclose, extra-treaty claims that such nationals might seek to bring against Hungary. *See id.* art. 26(1). Moreover, Article 32's one-way waiver provision—eliminating claims arising out of the war by Hungary on behalf of itself or its nationals against the Allied and Associated Powers but not vice versa, *id.* art. 32(1)—convinces us that Article 26 lacks such exclusionary language by design. As further evidence of its non-exclusive nature, Article 26 overlaps in coverage with Article 27: A United Nations national who was "under Hungarian jurisdiction" during the war and whose property Hungary confiscated on account of their religion would fall within the scope of both Articles. *Id.* art. 27; *see id.* arts. 26-27. We therefore do not read Article 26 to provide an exclusive avenue for covered individuals to seek compensation for property

losses during the war. And, accordingly, we see no "express conflict" between permitting the Survivors' action to proceed under the FSIA and Article 26 of the 1947 Treaty. *Simon I*, 812 F.3d at 140; *accord Amerada Hess*, 488 U.S. at 441-43.

The Hungarian defendants counter that, because our reasoning in *Simon I* "relied on Plaintiffs' *Hungarian* nationality to hold that the treaty exception did not bar" their claims, we must reach a "different result" now that the Survivors deny their Hungarian nationality. Hungary Br. 28-29. But our principal reasoning in *Simon I* was that the Treaty's text did not support the defendant's exclusive-remedy argument. Building from there, the analysis specific to Hungarian nationals provided "context" that we concluded "further weigh[ed] against construing [Article 27] to foreclose extra-treaty claims." *Simon I*, 812 F.3d at 138. We found it informative, for instance, that the Allied powers "could, and did, impose an obligation on Hungary to provide a *minimum* means of recovery to Hungarian victims for Hungary's wartime wrongs," but we did not read Article 27 to implicitly "render that means of recovery an exclusive one because [the Allies] had no power to settle or waive the extra-treaty claims of another country's (Hungary's) nationals." *Id*. In other words, the case for non-exclusivity was even stronger when considering Article 27 as applied to Hungarian nationals. *See id.* at 138-39. But, given the clear textual support detailed above, those additional points are not necessary to our conclusion here that neither Article 26 nor 27 bars extra-treaty claims by non-Hungarian nationals.

In short, we perceive no conflict between the provisions of the 1947 Treaty relied on by the defendants and permitting those Survivors who have plausibly alleged Czechoslovakian nationality to proceed under the FSIA's expropriation exception. We thus affirm the district court's denial of the

Hungarian defendants' motion to dismiss the Survivors' claims on that ground.

## VI.

That brings us to the Hungarian defendants' final argument: that the expropriation exception's requirement of a nexus between the disputed property and a defendant's commercial activity in the United States remains unmet. The expropriation exception requires that the property at issue in the suit "or any property exchanged for such property" be either (1) "present in the United States in connection with a commercial activity carried on in the United States by the foreign state" or (2) "owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States." 28 U.S.C. § 1605(a)(3). Even as the FSIA defines "foreign state" to include subdivisions and agencies or instrumentalities of the state, *id*. § 1603, the Act describes distinct routes to pierce the state's immunity by reference to its own conduct and that of its agencies or instrumentalities, *id*. § 1605. The first clause of the commercial-activity nexus requirement addresses immunity of foreign states in terms of the states' own conduct, while the second clause addresses it in terms of actions of foreign-state agencies or instrumentalities. *Id*. § 1605(a)(3); *see de Csepel II*, 859 F.3d at 1107. Generally speaking, each clause specifies a requisite connection between the defendant and both (i) "the expropriated property or proceeds thereof" and (ii) "some kind of commercial activity in the United States." *Simon I*, 812 F.3d at 146. For ease of reference, we use "property element" and "commercial-activity element," respectively, to refer to these two components of the commercial-activity nexus requirement.

The district court held that the *Simon* plaintiffs' suit meets the relevant property and commercial-activity requirements as to Hungary and MÁV. *See Simon-2020*, 443 F. Supp. 3d at 116. It concluded that the *Simon* plaintiffs adequately alleged that both Hungary and MÁV continue to possess property obtained in exchange for the plaintiffs' expropriated property, and that both engage in the requisite commercial activities in the United States. *Id.*[1]

The Hungarian defendants ask us to reverse that decision. We instead remand to the district court for factfinding as to two points relevant to the commercial-activity nexus requirement: first, whether the property at issue in the claims against both Hungary and MÁV derived from the *Simon* plaintiffs' expropriated property and, second, whether MÁV engages in commercial activity in the United States. As to those components of the commercial-activity requirement, the district court, proceeding in the wake of jurisdictional discovery, did not sufficiently respond to the Hungarian defendants' factual challenges to the court's jurisdiction. First, on the property element, the district court failed to "go beyond the pleadings and resolve [the] disputed issues of fact." *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000). Second, on MÁV's commercial activity in the United States, the district court erroneously relied on the pleading-stage ruling on the point in *Simon I* as law of the case, so did not make the findings of fact called for in response to the defendants' factual challenge. Finally, as for Hungary's

---

[1] In *Heller*, the district court did not reach this issue because it concluded that the "the domestic takings rule alone suffice[d] to grant the [Hungarian defendants'] motion [to dismiss]." *Heller*, 2022 WL 2802351, at *9. Given that we affirm the district court's dismissal of the *Heller* plaintiffs' claims on domestic takings rule grounds, we do not address whether the *Heller* plaintiffs' claims satisfy the commercial-activity nexus requirement.

commercial activity, we affirm the district court's conclusion—based on stipulated facts—that Hungary engaged in the requisite commercial activity through its issuance of bonds in the United States. We address each of these three components in turn.

A.

The district court did not make findings of fact regarding the disputed property and the defendants' commercial activity in the United States, as required in response to the Hungarian defendants' factual challenges to the applicability of the FSIA's expropriation exception. The district court's task in assessing jurisdiction under the FSIA varies depending on whether the defendant presents a legal or a factual challenge. *See Phoenix Consulting*, 216 F.3d at 40. "If the defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations, then the district court should take the plaintiff's factual allegations as true and determine whether they bring the case within any of the exceptions to immunity invoked by the plaintiff," *id.*, drawing "all reasonable inferences in [the plaintiff's] favor," *Schubarth*, 891 F.3d at 401. The Rule 12(b)(1) standard in this context "is similar to that of Rule 12(b)(6), under which dismissal is warranted if no plausible inferences can be drawn from the facts alleged that, if proven, would provide grounds for relief." *Valambhia*, 964 F.3d at 1139 (quoting *Schubarth*, 891 F.3d at 398).

By contrast, when a defendant moves beyond assuming the truth of well-pleaded facts and seeks at the jurisdictional threshold to challenge the factual basis of the court's jurisdiction—for instance, by factually disputing the *Simon* plaintiffs' jurisdictional allegations—"the court must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary" to resolve the Rule

12(b)(1) motion. *Phoenix Consulting*, 216 F.3d at 40. Put simply, if a decision about the existence of jurisdiction under the FSIA "requires resolution of factual disputes, the court will have to resolve those disputes." *Helmerich*, 581 U.S. at 187. In so doing, "[t]he district court retains 'considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction,' but it must give the plaintiff 'ample opportunity to secure and present evidence relevant to the existence of jurisdiction.'" *Phoenix Consulting*, 216 F.3d at 40 (quoting *Prakash v. Am. Univ.*, 727 F.2d 1174, 1179-80 (D.C. Cir. 1984)).

"Regardless of the procedures the court follows, however, the sovereign 'defendant bears the burden of proving that the plaintiff's allegations do not bring its case within a statutory exception to immunity.'" *Price*, 389 F.3d at 197 (quoting *Phoenix Consulting*, 216 F.3d at 40); *accord de Csepel v. Republic of Hungary*, 27 F.4th 736, 743 (D.C. Cir. 2022). That is because sovereign immunity is an "affirmative defense." *EIG Energy*, 894 F.3d at 345. Accordingly, the "burden of proof in establishing the inapplicability of [the FSIA's] exceptions is upon the party claiming immunity." *Transam. S.S. Corp. v. Somali Democratic Republic*, 767 F.2d 998, 1002 (D.C. Cir. 1985) (citing H.R. Rep. No. 94-1487, at 6-7 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604); *see* H.R. Rep. No. 94-1487, at 17 (1976), *reprinted in* 1976 U.S.C.C.A.N. at 6616.

Here, the Hungarian defendants raised a factual challenge to the Survivors' allegations regarding the property element. Although their motion-to-dismiss briefing principally argued that the *Simon* plaintiffs' pleadings had failed to satisfy the "heightened pleading standard" that they claimed *Helmerich* established, Hungary Mot. to Dismiss 22; *see id.* at 22-24; *see also* Part III.B, *supra*, they also filed fact declarations as attachments to their motion to dismiss, *see* Hungary Mot. to

Dismiss, Exs. 1-6; Dkt. Sheet 29 (J.A. 29). The Hungarian defendants relied on those declarations to factually question the *Simon* plaintiffs' allegations that property exchanged for their confiscated property is present in the United States in connection with Hungary's commercial activity or possessed by MÁV. *See* Hungary Mot. to Dismiss 23; Dkt. Sheet 29 (J.A. 29). Those declarations drew on Hungarian state archival records related to the Holocaust to conclude that it is impossible to trace the current location of the property Hungary allegedly seized or the proceeds thereof. *See* Botos Decl. ¶ 4 (J.A. 823); Csösz Decl. ¶ 5 (J.A. 834); Kovács Decl. ¶ 4 (J.A. 842).

The *Simon* Survivors countered by citing evidence in the record that "Hungary nationalized the expropriated property, sold it, and mixed the proceeds with the general state funds, which are used to fund various governmental commercial operations." Survivors' Br. 62 n.33; *see id.* at 62-63. They identified three sources of record support for those facts. First, they cited a declaration of a Hungarian attorney that describes, and attaches as an accompanying exhibit, a 1993 decision of the Hungarian Constitutional Court that includes the court's findings regarding Hungary's expropriation and use of property confiscated from Jews during the Holocaust. *See id.* at 62-63; Second Hanák Decl. ¶ 44 (J.A. 359); Second Hanák Decl., Ex. 8 (J.A. 414-40). The *Simon* plaintiffs' second declaration attaches and describes microfilm archives at the Holocaust Museum in Washington, D.C., that show "records of the confiscation, processing, and distribution of Jewish property in Hungary 1944." Fax Decl. ¶¶ 7-8 (J.A. 452); Fax Decl., Ex. 15 (*see* J.A. 750-61); Fax Decl., Ex. 16 (J.A. 762-71). Third, they submitted a study co-authored by one of the Hungarian defendants' declarants, Dr. László Csösz, which, *inter alia*, identifies a Hungarian "Ministry of Finance's account" where proceeds from the liquidation of Jewish assets

were deposited. Fax Decl., Ex. 17, at 23 (J.A. 794); *see id.* at 1-2 (J.A. 772-73). The *Simon* Survivors also submitted evidence of the presence of Hungarian funds used in connection with Hungary's commercial activity in the United States, as further discussed below.

In this posture, resolving the Hungarian defendants' motion to dismiss required resolving the "dispute over the factual basis of the court's subject matter jurisdiction under the FSIA." *Phoenix Consulting*, 216 F.3d at 40. The district court was, accordingly, required to "go beyond the pleadings" and make findings of fact germane to the expropriation exception's property element—namely, whether property defendants received in exchange for the *Simon* plaintiffs' confiscated property is present in the United States in connection with Hungary's commercial activity there or is possessed by MÁV. *Id.*; *see also Helmerich*, 581 U.S. at 187.

The district court did not do so here: It examined a mix of factual allegations and evidence submitted by the parties but does not appear to have undertaken the requisite factfinding to support its jurisdiction. *See Simon-2020*, 443 F. Supp. 3d at 103-05. The district court continued to view the central question as whether the *Simon* plaintiffs' "*allegations* suffice to raise a plausible inference that the defendants retain some portion of the expropriated property." *Id.* at 104 (emphasis added). It characterized the evidence submitted by the *Simon* plaintiffs as "bolster[ing] the plausibility of [those] allegations," and framed its conclusion as one that the "allegations suffice" to establish jurisdiction under the FSIA. *Id.* at 104, 116. Rather than find that the defendants had (or had not) established by a preponderance of the evidence that their property does not derive from the challenged expropriations, *see Simon I*, 812 F.3d at 147, the district court referred to the *Simon* plaintiffs' allegations rather than

evidence, concluding that the defendants' "declarations do not affirmatively disprove the plausible inference drawn from the plaintiffs' complaint," *Simon-2020*, 443 F. Supp. 3d at 105. Remand is therefore warranted to enable the district court to make the necessary factual findings. *See, e.g.*, *Phoenix Consulting*, 216 F.3d at 38, 41-40; *see also Helmerich*, 581 U.S. at 187.

The Hungarian defendants advance two primary counterarguments in support of their request for reversal, neither of which carries the day. They first argue that the district court erred by applying a legal standard that *Helmerich* displaced. *See* Hungary Br. 37. As discussed in Part III.B, *supra*, the defendants misread *Helmerich*. Next, the Hungarian defendants contend that, in any event, they are entitled to reversal because the *Simon* plaintiffs failed to "produce evidence tracing property in the United States or possessed by MÁV to property expropriated from them during World War II." *Id.* at 44. That argument fails at the gate: The plaintiffs had no such burden here.

The FSIA's expropriation exception requires that the property at issue, "*or any property exchanged for such property*," be present in the United States in connection with the foreign state's commercial activity, or "owned or operated by an agency or instrumentality of the foreign state" that engages in commercial activity in the United States. 28 U.S.C. § 1605(a)(3) (emphasis added). Congress knew that an expropriating foreign state or instrumentality thereof might "exchange[]" or liquidate the stolen property—*i.e.* convert it to cash or cash equivalents. *Id.* It included language in the FSIA to enable plaintiffs to satisfy the expropriation exception's jurisdictional nexus requirements in those circumstances. *Id.*

Requiring plaintiffs whose property was liquidated to allege and prove that they have traced funds in the foreign state's or instrumentality's possession to proceeds of the sale of their property would render the FSIA's expropriation exception a nullity for virtually all claims involving liquidation. Given the fungibility of money, once a foreign sovereign sells stolen property and mixes the proceeds with other funds in its possession, those proceeds ordinarily become untraceable to any specific future property or transaction. The Hungarian defendants' proposed rule could thus thwart most claims under the expropriation exception: A foreign sovereign would need only commingle the proceeds from illegally taken property with general accounts to insulate itself from suit under the expropriation exception. We decline to ascribe to Congress an intent to create a safe harbor for foreign sovereigns who choose to commingle rather than segregate or separately account for the proceeds from unlawful takings.

We came to a similar conclusion in *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123 (D.C. Cir. 2004), with respect to tracing foreign-state funds for purposes of material support under the FSIA's terrorism exception. *See id.* at 1130-33; 28 U.S.C. § 1605(a)(7) (2002).[2] That exception requires a link between a foreign state's material support and the act of terrorism that harmed the plaintiff. 28 U.S.C. § 1605(a)(7) (2002); *see Kilburn*, 376 F.3d at 1130. The defendants argued that, for the exception to apply, the plaintiff

---

[2] In 2008, after our decision in *Kilburn*, Congress relocated the terrorism exception from 28 U.S.C. § 1605(a)(7) to 28 U.S.C. § 1605A, "but the relevant language remains substantially identical to that considered in *Kilburn*." *EIG Energy*, 894 F.3d at 346 n.4 (citing National Defense Authorization Act for Fiscal Year 2008, Pub. L. 110-181 § 1083(a), (b)(1)(A)(iii), 122 Stat. 3, 338-41). In the interest of consistency with *Kilburn*'s references, we quote and cite the version included in the 2002 edition of the U.S. Code.

must allege and ultimately prove that a state's "material support" is "directly traceable to the particular terrorist act" that gives rise to the underlying claim. *See Kilburn*, 376 F.3d at 1130 (emphasis omitted). We rejected that argument. Because money is "fungible, and terrorist organizations can hardly be counted on to keep careful bookkeeping records," we explained, "[i]mposing a jurisdictional requirement that a state sponsor's financial assistance to a terrorist organization must be *directly* traceable to a particular terrorist act, would likely render § 1605(a)(7)'s material support provision ineffectual." *Id.* With regard to "property taken in violation of international law," 28 U.S.C. § 1605(a)(3), relying on foreign sovereigns and their agencies to segregate resulting proceeds and "keep careful bookkeeping records" poses similar hazards, *Kilburn*, 376 F.3d at 1130.

We hold that the *Simon* plaintiffs need not produce evidence directly tracing the liquidated proceeds of their stolen property to funds retained by the defendants in order to survive the defendants' factual challenge to the court's jurisdiction under the FSIA's expropriation exception. Rather, because "the sovereign 'defendant bears the burden of proving that the plaintiff's allegations do not bring its case within a statutory exception to immunity,'" *Price*, 389 F.3d at 197 (quoting *Phoenix Consulting*, 216 F.3d at 40); *accord EIG Energy*, 894 F.3d at 344-45, defendants who wish to disclaim property they seized and liquidated must at least affirmatively establish by a preponderance of the evidence that their current resources do *not* trace back to the property originally expropriated. In keeping with the parties' respective burdens, evidence that "merely confirm[s] the difficulty of tracing individual paths of exchange," will—as the district court observed—"hurt[] rather than help[] the defendants" in that endeavor. *Simon-2020*, 443 F. Supp. 3d at 105.

It is the province of the district court to find facts, including the requisite jurisdictional facts regarding the property element. The district court has wide "latitude [to] devis[e] the procedures" necessary "to ferret out the facts pertinent to jurisdiction," *Phoenix Consulting*, 216 F.3d at 40 (quoting *Prakash*, 727 F.2d at 1179), should it determine that any additional jurisdictional discovery or evidentiary submissions would be appropriate. We therefore remand to the district court to make the factual findings necessary to a determination whether the property component of the commercial-activity nexus requirement is satisfied as to Hungary and MÁV.

## B.

Next, we turn to the question whether MÁV engages in commercial activity in the United States. Here, too, we conclude the district court failed appropriately to respond to the Hungarian defendants' factual challenge by making findings of fact. Instead, the district court relied on law-of-the-case doctrine to treat *Simon I*'s pleading-stage ruling on the point as dispositive. *See Simon-2020*, 443 F. Supp. 3d at 111-12, 116.

Law-of-the-case doctrine applies only where a prior ruling in the case resolved the same question that a party asks the court to revisit. *See Wye Oak Tech., Inc. v. Republic of Iraq*, 24 F.4th 686, 698 (D.C. Cir. 2022); *Kimberlin v. Quinlan*, 199 F.3d 496, 500 (D.C. Cir. 1999). When the prior ruling occurred at a "distinct procedural" stage of the case, it may not provide the type of resolution required at a later stage. *Wye Oak*, 24 F.4th at 698. We deemed law-of-the-case doctrine inapplicable in *Wye Oak*, for instance, because the prior ruling at issue assessed only "the legal sufficiency of [the] complaint for the purpose of proceeding to discovery," and we were then reviewing a post-trial judgment made on the basis of "a

developed factual record" following a "full adversarial hearing." *Id.* at 697-98.

Given those principles, the district court erred by deeming dispositive *Simon I*'s ruling on MÁV's commercial activity. In *Simon I*, we determined that the plaintiffs had adequately pleaded MÁV's commercial activity. *See* 812 F.3d at 147-48. We accordingly reversed the district court's grant of the Hungarian defendants' motion to dismiss. In so doing, we noted that questions of proof would await "any factual challenge by the Hungarian defendants." *Id.* at 147, 151.

The Hungarian defendants then raised a factual challenge with respect to MÁV's commercial activity. *See* Hungary Mot. to Dismiss 9-11; Dkt. Sheet 29 (J.A. 29); *Simon-2020*, 443 F. Supp. 3d at 112-14. They factually contested the *Simon* plaintiffs' allegations that MÁV-START, another Hungarian entity, is an agent of MÁV, and argued that MÁV cannot be subjected to the jurisdiction of a U.S. court based on the activities of MÁV-START. Hungary Mot. to Dismiss 9-11. The district court granted the parties' request for limited jurisdictional discovery "concerning the averments in the declarations [filed] in support of" the Hungarian defendants' motion to dismiss. Dkt. Sheet 29 (J.A. 29) (internal quotation marks omitted). And the *Simon* plaintiffs thereafter filed a declaration and accompanying exhibits regarding MÁV's relationship with MÁV-START in support of their opposition to the defendants' motion to dismiss. *See* Dkt. Sheet 31 (J.A. 31); Schopler Decl. ¶¶ 3-18 (J.A. 1632-34); Schopler Decl., Exs. 11-17 (J.A. 1678-99). This factual challenge regarding the existence of a principal-agent relationship between MÁV and MÁV-START obligated the district court to go beyond the pleadings to resolve that dispute. *See Phoenix Consulting*, 216 F.3d at 40.

In taking up the factual challenge, however, the district court began its analysis by stating that it was "bound by the law of the case," and by what it described as the *Simon I* court's "finding about MÁV's commercial nexus to the United States." *Simon-2020*, 443 F. Supp. 3d at 111; *see also id.* at 111-12 (reasoning that the defendants' factual challenge to MÁV's commercial-activity nexus would succeed "only if one of the limited exceptions to the law of the case doctrine is met"). Even as the court went on to discuss the factual record developed by the parties following *Simon I*, it expressly invoked law of the case and grounded its conclusion regarding MÁV's commercial activity in what it described as this court's "prior finding" of MÁV's commercial activity in the United States. *See id.* at 116.

We do not suggest that the district court was wrong to draw on the legal ruling in *Simon I*, but only that doing so was insufficient once defendants pressed their factual challenge. We are in no position to discern whether the district court would have reached the conclusion about MÁV's commercial activity that it announced had it expressly made factual findings on the point. Accordingly, we remand for the district court to determine as a factual matter based on the evidence whether MÁV engages in commercial activity in the United States.

## C.

That leaves the Hungarian defendants' challenge regarding Hungary's commercial activity in the United States. We note, at the outset, that the procedural history on this issue differs from that of the previous two points in one respect: Whereas we deemed other allegations sufficient in *Simon I*, we held that the First Amended Complaint's "allegations about Hungary's commercial activity fail[ed] to demonstrate

satisfaction of § 1605(a)(3)'s nexus requirement." 812 F.3d at 148. As we explained, "the plaintiffs put forward only the bare, conclusory assertion that 'property is present in the United States in connection with commercial activity carried on by Hungary within the United States.' There is nothing more." *Id*. (quoting *Simon* First Am. Compl. ¶ 83 (J.A. 119)). We "express[ed] no view," however, "on whether [the plaintiffs could] (or should be allowed to) amend the complaint in this regard." *Id.*

On remand, the district court permitted the *Simon* plaintiffs to amend. *See* Dkt. Sheet 25 (J.A. 25). The *Simon* plaintiffs did so, *see id.* at 26 (J.A. 26), and added, *inter alia*, allegations regarding Hungary's issuance of bonds and military purchases in the United States, *see Simon* SAC ¶¶ 98-101 (J.A. 260-62). The Hungarian defendants then renewed their motion to dismiss, again arguing, *inter alia*, that the *Simon* plaintiffs had failed as a legal matter to satisfy the commercial-activity element as to Hungary. *See* Dkt. Sheet 29 (J.A. 29); *Simon-2020*, 443 F. Supp. 3d at 106-11. Following jurisdictional discovery, *see* Dkt. Sheet 29 (J.A. 29), the parties submitted a Joint Stipulation of Facts relevant to Hungary's commercial activity in the United States, *see* Joint Stip. (J.A. 1155-70). Relying principally on the facts set forth in the Joint Stipulation, the district court concluded Hungary engaged in the commercial activity required for purposes of the expropriation exception. *See Simon-2020*, 443 F. Supp. 3d at 106-11. In particular, the court held that "Hungary's bond offerings and military equipment purchases are sufficient to meet the commercial activity prong." *Id.* at 107.

On appeal, the Hungarian defendants argue that the district court erred in its analysis of both the bond offerings and military equipment purchases. They argue that the district court erroneously accepted Hungary's issuance of bonds and

military equipment purchases as satisfying the commercial-activity component of the expropriation exception. In their view, the district court misstated the central question under the commercial-activity inquiry in analyzing Hungary's issuance of bonds and erred in concluding that a state's participation in the U.S. Foreign Military Sales Program could qualify as commercial activity under the FSIA.

We affirm the district court's conclusion that the commercial-activity prong is met based on Hungary's issuance of bonds. Because that is sufficient to resolve the appeal with respect to Hungary's commercial activity, we do not consider Hungary's military equipment purchases. The commercial-activity nexus requirement, as it relates to foreign states, requires that the expropriated "property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state." 28 U.S.C. § 1605(a)(3). The FSIA defines commercial activity as "either a regular course of commercial conduct or a particular commercial transaction or act." *Id.* § 1603(d). The Act further specifies that the purpose of an activity does not determine its commercial character. Rather, courts should look to "the nature of the course of conduct or particular transaction or act." *Id.*

In *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607 (1992), the Court interpreted the term "commercial" in the FSIA's commercial activity exception. *See id.* at 612-14. It held that a foreign state's actions are "commercial" under the FSIA when the state "acts, not as regulator of a market, but in the manner of a private player within it." *Id.* at 614. Applying that standard, the Court held that Argentina's issuance of government bonds was a "commercial activity" under the FSIA. *Id.* at 617. As the Court explained, the bonds at issue were "in almost all respects garden-variety debt instruments";

private parties could hold them, trade them on the international market, and use them to secure a future stream of income. *Id.* at 615. Because "private parties regularly issue [such] bonds," Argentina's issuance constituted commercial activity for purposes of the FSIA. *Id*. at 616.

Application of *Weltover* to the relevant facts as stipulated by the parties establishes that Hungary's issuance of bonds in this case qualifies as "commercial activity" within the meaning of the FSIA. Two Hungarian bond issuances are illustrative. *See Simon-2020*, 443 F. Supp. 3d at 107-08. First, in 2005, Hungary filed a prospectus supplement with the United States Securities and Exchange Commission (SEC) offering $1.5 billion in notes for sale globally, of which approximately $582 million was "directly sold in the United States," with an additional $92 million "estimated to flow back into the United States from sales outside the United States." Joint Stip. ¶ 21 (J.A. 1158). "The notes issued under the 2005 Prospectus constituted direct, unconditional, unsecured and general obligations of Hungary," *id.* ¶ 25 (J.A. 1159), and the "[d]ebt securities issued under the 2005 Prospectus were outstanding in the United States throughout 2009, 2010, and 2011," *id.* ¶ 27 (J.A. 1159)—*i.e.*, both before and after the *Simon* plaintiffs filed their complaint. Second, in 2010, Hungary filed another prospectus supplement with the SEC. *Id.* ¶¶ 47-48, 51 (J.A. 1161-62). "The debt securities issued under the 2010 Prospectus" were notes due in January 2020, "bearing interest at the rate of 6.250% per year," accruing from January 2010, and "payable on July 29 and January 29 of each year, beginning on July 29, 2010." *Id.* ¶ 52 (J.A. 1162). In short, these two sets of bonds are materially indistinguishable from those at issue in *Weltover*: "They may be held by private parties; they are negotiable and may be traded on the international market . . . ; and they promise a future stream of cash income." 504 U.S. at

615.    Hungary's issuance of these bonds constitutes commercial activity within the meaning of the FSIA.

The Hungarian defendants dispute none of this. *See* Hungary Br. 52-53. Instead, they contend that Hungary's issuance of the bonds, although commercial in nature, is not germane to the commercial-activity nexus required here. *See id.* The real issue, they argue, is "who engaged in 'commercial activity in the United States' in connection with property exchanged for expropriated property." *Id.* at 53 (quoting 28 U.S.C. § 1605(a)(3)). According to the Hungarian defendants, "[t]he bonds themselves are not property exchanged for property expropriated from [p]laintiffs." *Id.* Rather, "[t]he only conceivably relevant property in the United States would be interest paid on the bonds to U.S. holders, and the relevant commercial activity in the United States would be the payment of that interest." *Id.* Because a separate entity, ÁKK Zrt. (ÁKK), made those interest payments, defendants argue, it is ÁKK that was engaged in the relevant commercial activity, if any. *See id.*; *see also* Joint Stip. ¶¶ 28, 55, 73-77 (J.A. 1159, 1162, 1165-66).

That argument misunderstands the link required between the relevant property and the foreign state's commercial activity in the United States. As noted, the expropriation exception requires that the confiscated "property or any property exchanged for such property [must be] present in the United States in connection with a commercial activity carried on in the United States by the foreign state." 28 U.S.C. § 1605(a)(3). If money derived from the proceeds of liquidating the *Simon* plaintiffs' stolen property is present in the United States as a result of Hungary's commercial activity in the United States (here, its issuance of bonds), the fact that another entity acting for Hungary is using those funds to make the interest payments for the bonds does not negate the fact that

the funds are "present in the United States in connection with a commercial activity carried on in the United States by" Hungary. *Id.*

Moreover, to the extent the Hungarian defendants suggest that Hungary's issuance of bonds occurred "outside the United States," Hungary Br. 52, any such argument is foreclosed by the record. The parties' Joint Stipulation of Facts explicitly states, "Hungary issued debt securities in the United States under the 2010 Prospectus." Joint Stip. ¶ 51 (J.A. 1162). Additionally, as the district court explained in detail, SEC filings produced by the *Simon* plaintiffs and uncontested by the Hungarian defendants identify Hungary as the issuer of (and entity responsible for) the debt securities offered in the United States. *See Simon-2020*, 443 F. Supp. 3d at 108; *see also, e.g.*, Fax Decl., Ex. 7, at 54 (J.A. 618) (SEC filing listing the "Republic of Hungary" as the "Issuer" of the 2010 bonds, and noting the securities being offered "constitute direct, unconditional, general and unsecured obligations of the Republic"); *id.* at 5 (J.A. 569) (SEC filing describing the 2010 bonds as "debt securities of the Republic, which are being offered globally for sale in the United States and elsewhere where such offer and sale is permitted").

The Hungarian defendants' challenge to the district court's ruling on Hungary's commercial activity is thus unavailing. We affirm the district court's ruling that the commercial-activity element is satisfied as to Hungary.

## VII.

For the foregoing reasons, we affirm the district court's dismissal of the Trianon Survivors' claims in its 2021 decision in *Simon* and 2022 decision in *Heller*. We likewise affirm the district court's 2021 disposition of the Hungarian defendants' motion to dismiss the remaining plaintiffs' claims, with the

exception of the Lebovics sisters, Zelikovitch, and Schlanger, whose claims we direct the district court to dismiss without prejudice. As for the district court's 2020 *Simon* decision on the commercial-activity nexus requirement, we affirm the district court's ruling as to Hungary's commercial activity. However, we vacate the court's ruling on the property component of the nexus in relation to both Hungary and MÁV, as well as on MÁV's commercial activity. We remand for the district court to make factual determinations on those points, as necessary to resolve the Hungarian defendants' challenge to the remaining plaintiffs' invocation of the expropriation exception.

We pause, at this juncture, to acknowledge the immense gravity of the claims at issue in this case and others like it. The atrocities committed by the Hungarian government during the Holocaust are unspeakable. And there is no denying that the survivors of Hungary's genocidal campaign deserve justice. The role of the courts of the United States in these cases depends on the factual record before it. Our legal authority is granted and limited by Congress. We are also checked by the reality that even the best remedies a court can provide for past harms are, by their nature, profoundly inadequate. That reality, always there in the background, is starkly evident in cases like these.

*So ordered.*

RANDOLPH, *Senior Circuit Judge*, concurring in part and dissenting in part: A basic judicial principle is that like cases must be treated alike. *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (en banc). My dissent is confined to the majority's compliance with that principle in its otherwise admirable opinion. That is, I cannot agree that four of the fourteen original *Simon* plaintiffs may continue with their action, given the Supreme Court's unanimous decision in *Federal Republic of Germany v. Philipp (Philipp III)*, 141 S. Ct. 703 (2021), and our decision on remand in *Philipp v. Stiftung Preussischer Kulturbesitz (Philipp VI)*, No. 22-7126, – F.4th –, 2023 WL 4536152 (D.C. Cir. July 14, 2023) (per curiam).

The *Philipp* case, involving the Nazis taking the property of Jews in Germany, and *Simon,* involving the taking of property of Jews in Hungary, raised comparable issues under the Foreign Sovereign Immunities Act. Our court naturally treated a decision in one as impacting the other. *See, e.g.*, *Simon v. Republic of Hungary (Simon II)*, 911 F.3d 1172, 1176 (D.C. Cir. 2018) (citing *Philipp v. Federal Republic of Germany (Philipp II)*, 894 F.3d 406 (D.C. Cir. 2018)). The Supreme Court did the same. The Court granted writs of certiorari in *Philipp* and *Simon* at the same time. *See* 141 S. Ct. 185 (July 2, 2020) (*Philipp*); 141 S. Ct. 187 (July 2, 2020) (*Simon*). And, as I next discuss, when the Court released its judgments in these two cases, it tied the cases together.

In *Philipp III*, the Supreme Court – disagreeing with our court – held unanimously that foreign states and their agencies are immune from suits in United States courts based on "a foreign sovereign's taking of its own nationals' property." *Id.* at 709–10. In rendering its opinion, the Court treated the plaintiffs in *Philipp* as German nationals when the Nazis confiscated their property. *See id.* The Court did so even though the *Philipp* plaintiffs, apparently anticipating an adverse decision, suggested to the Court (for the first time in the litigation) that they or their

ancestors might not have been German nationals on the relevant date. *See Philipp VI*, 2023 WL 4536152, at \*1. In response to this belated claim, the Supreme Court not only vacated our judgment in *Philipp* but also remanded the case for a determination whether the *Philipp* plaintiffs had preserved their new contention that they were not German nationals at the time of the alleged takings. *Philipp III*, 141 S. Ct. at 715–16.

On the same day, the Supreme Court issued the following *per curiam* order in this, the *Simon* case: "The judgment of the United States Court of Appeals for the D. C. Circuit is vacated, and the case is remanded for further proceedings consistent with the decision in [*Philipp III*]." *Republic of Hungary v. Simon (Simon III)*, 141 S. Ct. 691 (2021). The Court's mandate thus required, on remand, a decision whether the *Simon* plaintiffs, or any one of them, had preserved a claim that they were not Hungarian nationals when Hungary confiscated their property. In light of the mandate, the preservation question had to be determined because subject matter jurisdiction turned on it, at least as a preliminary matter.[1] *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006); *Capron v. Van Noorden*, 6 U.S. 126, 127 (1804) ("Here it was the duty of the Court to see that they had jurisdiction, for the consent of parties could not give it.").

In the appeal in the remanded *Philipp* case, we determined – in agreement with the district court – that the plaintiffs had failed to preserve a not-German-nationals claim. *Philipp VI*, 2023 WL 4536152, at \*2. The *Simon* case, also on appeal after remand, presents an even stronger ground for reaching the same

---

[1] The plaintiffs' burden to establish jurisdiction increases at later stages in litigation. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

result with respect to the plaintiffs' disclaimer of Hungarian nationality.[2]

As in *Philipp*, none of the plaintiffs in *Simon* alleged in their original complaint or in either of their amended complaints that they were nationals of a country other than Hungary at the time of the takings. *See Simon v. Republic of Hungary*, 579 F. Supp. 3d 91, 124 (D.D.C. 2021), *appeal dismissed*, 2022 WL 7205036 (D.C. Cir. Oct. 12, 2022). The majority attempts to fill this gap by quoting a sentence from one of the plaintiffs' district court memoranda from twelve years ago. Maj. Op. 30. There are two problems with the attempt. An obvious one is that the quotation does not alter the fact that the plaintiffs' pleadings – their complaint and amended complaints – never alleged that they were Czechoslovakian nationals at the time of the alleged takings. The second is that the plaintiffs were arguing the opposite of what the majority thinks. That is, in the quoted passage the plaintiffs were disputing the claim of the Hungarian state at the start of World War II that they were no longer "citizens" of Hungary despite the fact – as plaintiffs stated in their preceding sentence – that the "14 Named Plaintiffs are Holocaust survivors who lived in the Hungarian State at the threshold of World War II." Pls.' Opp'n 3, 17, *Simon v. Republic of Hungary*, No. 1:10-cv-01770-BAH (D.D.C. May 6, 2011), ECF No. 24.

---

[2] The majority tries to distinguish *Philipp*. *See* Maj. Op. 29–30. But as the majority suggests, the *Philipp* plaintiffs *did* plead facts that could meet the "minimum requirements" for a non-German nationality. *See* Maj. Op. 30; Second Amended Complaint at ¶¶ 55, 170, *Philipp v. Stiftung Preussischer Kulturbesitz* No. 1:15-cv-00266-CKK (D.D.C. September 9, 2021), ECF No. 62. And the *Philipp* plaintiffs *did* press their non-German-nationality argument before the Supreme Court (unlike the plaintiffs here). *See Philipp VI*, 2023 WL 4536152, at *1.

4

As in *Philipp*, the *Simon* plaintiffs had "every opportunity" – and indeed, every incentive – to allege in their original complaint or in their amended complaints that they were Czechoslovakian nationals.[3] *Philipp VI*, 2023 WL 4536152, at *2. But unlike the plaintiffs in *Philipp*, the *Simon* plaintiffs never informed the Supreme Court that they even contemplated asserting such an allegation. Instead, the *Simon* plaintiffs represented to the Supreme Court in the clearest possible terms that they were all Hungarian nationals when the takings occurred: "All 14 of the Survivors were Hungarian nationals during World War II but have adopted other nationalities since escaping the atrocities of the Hungarian government." Brief in Opposition at 4–5, *Simon III*, 141 S. Ct. 691 (2021) (No. 18-1447), 2019 WL 3380416 at *4–5. That too had been our court's understanding when the case reached us on appeal: "The named plaintiffs in this case are fourteen Jewish survivors of the Hungarian Holocaust. All fourteen were Hungarian nationals during World War II but have since adopted other nationalities."

---

[3] The *Simon* plaintiffs devoted a portion of their Supreme Court merits brief to the FSIA expropriation exception because Hungary had "contested this question of subject matter jurisdiction below" and "intend[ed] to reap the benefits if Germany prevail[ed]" in the *Philipp* case. Brief for Respondents at 42 n.5, *Simon III*, 141 S. Ct. 691 (2021) (No. 18-1447), 2020 WL 6292564 at *42 n.5; *see also* Reply Brief for Appellants Rosalie Simon, et. al. at 9, *Simon v. Republic of Hungary (Simon I)*, 812 F.3d 127 (D.C. Cir. 2016) (No. 14-7082), 2014 WL 6603413 at *9 ("Hungary alleges that international law is not implicated where the wrongful conduct is perpetrated against a state's own citizens or nationals."); Opposition Brief of Defendants-Appellees at 32, *Simon I*, 812 F.3d 127 (D.C. Cir. 2016) (No. 14-7082), 2014 WL 5795145 at *32 (no violation of international law because "Plaintiffs were Hungarian nationals at the time of the events in question").

*Simon v. Republic of Hungary (Simon I)*, 812 F.3d 127, 134 (D.C. Cir. 2016).[4]

The short of the matter is that the *Simon* plaintiffs, like the plaintiffs in *Philipp*, did not preserve a claim that they were nationals of a country other than Hungary when the takings occurred. The longstanding rule of this circuit, and of the other circuits,[5] is as follows: "It is elementary that where an argument could have been raised on an initial appeal, it is inappropriate to consider that argument on a second appeal following remand." *Northwestern Indiana Tel. Co. v. F.C.C.*, 872 F.2d 465, 470 (D.C. Cir. 1989) (quoted in *United States v. Henry*, 472 F.3d 910, 913 (D.C. Cir. 2007)). As we held in *Philipp*, in order to "preserve a claim, a party must raise it 'squarely and distinctly.'" *Philipp*, 2023 WL 4536152, at *2 (quoting *Bronner on Behalf of Am. Stud. Ass'n v. Duggan*, 962 F.3d 596, 611 (D.C. Cir. 2020)). The *Simon* plaintiffs did neither.

---

[4] The plaintiffs argued that Article 27 of the 1947 Peace Treaty applied to them because they were Hungarian nationals when Hungary took their property. *See* Reply Brief for Appellants Rosalie Simon, et. al. at 3, *Simon I*, 812 F.3d 127 (D.C. Cir. 2016) (No. 14-7082), 2014 WL 6603413 at *3.

[5] *See, e.g.*, *Omni Outdoor Advert., Inc. v. Columbia Outdoor Advert., Inc.*, 974 F.2d 502, 505 (4th Cir. 1992); *United States v. Morris*, 259 F.3d 894, 898 (7th Cir. 2001); *Christian Legal Soc'y Chapter of Univ. Of Cal. v. Wu*, 626 F.3d 483, 486–88 (9th Cir. 2010).